UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
—————————————————————

UNITED STATES OF AMERICA,

                    Plaintiff,

       v.

JUAN SAMPEL,

                    Defendant.

—————————————————————

                           <u>REPORT & RECOMMENDATION</u>

                           16-CR-6107CJS

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Charles J. Siragusa, United States District Judge, dated November 3, 2016, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 124).

On November 3, 2016, the grand jury returned an indictment against Juan Sampel ("Sampel" or "defendant"), charging him with one count of conspiring between 2015 and April 27, 2016, to possess with the intent to distribute and to distribute five kilograms or more of cocaine, in violation 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).  (Docket # 123).

Currently pending before this Court for Report and Recommendation are Sampel's motions for a *Franks* hearing and to suppress wiretap evidence, statements, identification testimony, GPS tracking evidence, and evidence seized pursuant to the execution of a search warrant.[1]  (Docket ## 152, 158).  For the reasons discussed below, I recommend that the district court deny Sampel's motions.

—————————————

      [1] Sampel filed omnibus motions seeking other forms of relief including, *inter alia*, an audibility hearing, a bill of particulars, discovery and inspection, a conspiracy hearing, *Brady* material, Rule 404(b), 608 and 609

## FACTUAL BACKGROUND

### I.    Warrants Authorizing Interception of Electronic Communications

The investigating agents in this case used court-ordered wire and electronic surveillance on seven telephone numbers.  Pursuant to Federal Rule of Criminal Procedure 12(b)(4), the government filed an Amended Notice indicating its intent to use evidence from five of those telephones:  585-733-9383 (Target Telephone One); 585-857-1888 (Target Telephone Two); 585-503-4746 (Target Telephone Three); 585-201-1510 (Target Telephone Four); and, 585-524-8457 (Target Telephone Five).  (Docket # 149).

Each warrant application was supported by a lengthy affidavit describing evidence gathered during the investigation.  Sampel challenges each of the wiretap orders on the grounds that the government failed to exhaust other investigative procedures.  (Docket # 152 at 18).[2]  This Court's factual recitation of the allegations in those wiretap applications is limited to that relevant to the issue of exhaustion of other investigative procedures.

### A.    Wiretap Warrant for 585-733-9383 (Target Telephone One)

On January 22, 2016, Judge Siragusa issued an eavesdropping warrant to intercept electronic communications over Target Telephone One.  Special Agent Christopher Mahaffy ("Mahaffy"), an agent employed by the Drug Enforcement Administration ("DEA"), submitted a seventy-six page affidavit in support of his application for the warrant.  ("Mahaffy Aff. 1").[3]  On

---

evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 152).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on September 25, 2017.  (Docket ## 156, 157).

[2]  Sampel's motion also challenges interception of communications over 585-481-7413, although the Court has no orders relating to interception over such number, and the government has not noticed its intent to use any evidence intercepted over that number.  (*See* Docket # 152 at 18).

[3]  This affidavit and the other wiretap affidavits at issue were submitted by the government on a CD, which has been docketed.  (Docket # 165).

February 18, 2016, Judge Siragusa authorized the continued interception of electronic communications over Target Telephone One for an additional thirty days, based upon another affidavit sworn by Mahaffy.  ("Mahaffy Aff. 1a").

In his first affidavit, Mahaffy noted that the investigation had been based on record checks, physical surveillance, interviews of witnesses, use of confidential sources, consensual recordings of telephone and face-to-face conversations, information obtained from a pen register and trap and trace, subpoenaed telephone records, information from files of the DEA and Rochester Police Department ("RPD"), and information received from other federal, state, and local law enforcement agencies.  (Mahaffy Aff. 1 at ¶ 3).  Based on the investigation, Mahaffy believed that Dennis Smith, Darren Smith, Kaleaf Ball, Juan Sampel, Thomas V. Taliento, Reginald L. Streeter, and Donde Lindsay (together, "the target intercepts"), and others yet known, were committing the following offenses:

    (a)   possession with intent to distribute, and distribution of, controlled substances, in violation of 21 U.S.C. § 841(a)(1);

    (b)   use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b);

    (c)   conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846;

    (d)   maintaining premises for drug distribution, in violation of 21 U.S.C. § 856(a)(1);

    (e)   conspiracy to commit money laundering, in violation of 21 U.S.C. § 1956(h);

    (f)   possession of firearms by convicted felons, in violation of 18 U.S.C. § 922(g)(1); and,

    (g)   possession of firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1).

(*Id.* at ¶¶ 4-5).  Mahaffy disclosed that Dennis Smith ("Smith") was believed to use Target Telephone One.  (*Id.* at ¶ 7).  Mahaffy's affidavit listed the target interceptees' known criminal records, many of which were extensive and included multiple convictions for drug-related crimes.  (*Id.* at ¶¶ 16-22).

Mahaffy described that in mid-2014 investigating agents began receiving information from a confidential source, CS1, that Smith, whom CS1 had known for over ten years, was selling cocaine in the Rochester, New York area.  (*Id.* at ¶ 24).  CS1 told officers that CS1 had been purchasing cocaine from Smith since 2010, had observed Smith in possession of "multiple kilograms of cocaine" over the years, and had seen Smith in possession of cocaine as recently as January 2016.  (*Id.* at ¶ 26).  CS1 observed Smith brandish a handgun approximately ten years earlier during a narcotics-related dispute.  (*Id.* at ¶ 28).  CS1 also told officers that Smith had purchased multiple properties in the Rochester area.  (*Id.*).  Mahaffy affirmed that a review of public records revealed that Smith owned eight properties in Rochester.  (*Id.*).  CS1 provided agents with two telephone numbers for Smith, one of which was Target Telephone One.  (*Id.*).

Mahaffy described six separate occasions between May 2015 and January 2016 on which CS1 made controlled purchases of cocaine from Smith.  (*Id.* at ¶¶ 32-49).  CS1 arranged each transaction by communicating with Smith via text message or telephone call on Target Telephone One and/or 585-739-8437.  (*Id.*).  Their communications involved coded language that they had previously agreed to employ.  (*Id.* at ¶¶ 32-33, 36-38, 40, 42, 44).  Agents conducted surveillance during each of the controlled purchases, and all but two were consensually recorded and monitored.  (*Id.* at ¶ 32).

On November 12, 2015 and January 11, 2016, United States Magistrate Judge Jonathan W. Feldman issued Orders authorizing the installation and use of a pen register, trap and trace device, and caller identification on Target Telephone One.  (*Id.* at ¶ 50).

According to Mahaffy's affidavit, between November 12, 2015 and January 10, 2016,[4] approximately 2,780 calls and 2,052 text messages were transmitted to and from Target Telephone One, including multiple calls and text messages from telephone numbers linked to individuals with prior drug and firearms convictions and known involvement in drug activities. (*Id.* at ¶¶ 50-64).

For example, pen register data revealed that between November 12, 2015 and January 10, 2016, Target Telephone One placed calls to or received calls from telephone number 585-503-4746 on approximately forty-eight occasions and text messages on two occasions.  (*Id.* at ¶ 52).  Subscriber records for this number showed that it was listed to "Big Dude" at 1084 South Laurel Road, London, Kentucky 40744.  (*Id.*).  According to Mahaffy, a confidential source, CS5, identified Kaleaf T. Ball as the user of the number.  (*Id.* at ¶¶ 52-53).  CS1 identified Ball as a "close confidante and high ranking member of the Smith narcotics trafficking organization [who] distribute[d] cocaine that he receive[d] from Smith."  (*Id.* at ¶ 53).  Mahaffy affirmed that another confidential source, CS3, made two controlled purchases of cocaine from Ball in October and November 2010.  (*Id.*).  A search of Ball's residence in November 2010 resulted in the seizure by law enforcement agents of approximately 30.20 grams of cocaine, 12.30 grams of crack cocaine, and $8,400 in cash.  (*Id.*).  In addition, Mahaffy recounted that a confidential source had informed another agent that Smith and Ball planned to travel to Las

---

[4]  Although one paragraph in Mahaffy's affidavit refers to the period "[b]etween November 12, 2015, and January 10, 2015," a subsequent paragraph refers to the period "between November 12, 2015 and January 10, 2016," and the Court will assume that the first reference to January 10, 201*5* is a typographical error.  (*Compare id.* at ¶ 50 *with* ¶ 52).

Vegas, Nevada.  (*Id.*).  Surveillance conducted at the Greater Rochester International Airport on August 6, 2015, revealed that Smith, Smith's son, and one other male checked into Delta Air Lines.  (*Id.*).  Subpoenaed records from Delta Airlines showed that Ball had a ticket for Las Vegas on that date that was purchased by Smith.  (*Id.*).

Mahaffy's affidavit identified numerous goals and objectives of the investigation, including gathering sufficient evidence to identify the specific times, locations, and individuals involved in the processing, packaging, storing, and distributing of controlled substances; developing sufficient evidence to prosecute the targets and other unknown co-conspirators; and, seizing substantial quantities of controlled substances and dismantling the distribution network. (*Id.* at ¶ 65).

In his affidavit in support of the application for the continued interception of electronic communications over Target Telephone One, Mahaffy included transcripts of several intercepted communications in which Smith allegedly arranged purchases or sales of cocaine. (Mahaffy Aff. 1a at ¶¶ 20-69).  Mahaffy described that on multiple occasions law enforcement used the information they received from intercepted communications, along with surveillance evidence, to identify the participants in and locations of the drug transactions.  (*Id.* at ¶¶ 27-28, 30, 36, 55, 69).

Based on the intercepted communications, Mahaffy affirmed his belief that "the Target Subjects have several unidentified cocaine sources of supply and that they purchase approximately five to seven kilograms of cocaine every two weeks and then break this cocaine into smaller amounts for distribution to customers in the Rochester area."  (*Id.* at ¶ 18). According to Mahaffy, although agents had identified Juan Sampel as Smith's source of cocaine, Sampel's role had "yet to be confirmed."  (*Id.* at ¶¶ 18, 71).  Also still undetermined was "the

amount of cocaine distributed," "the identity of the individual(s) from whom Sampel obtained

the drugs," "and the precise nature and extent of the drug relationship between Smith and Ball."

(*Id.* at ¶ 71). Mahaffy noted that there was "little information regarding the ultimate source and

origin of the cocaine in Rochester, New York, the identity of those [who] transport[ed] the drugs,

or the manner in which the drugs [were] being delivered to" the area. (*Id.* at ¶ 74). Mahaffy also

stated that the investigating agents had not identified "all of the suppliers of the drugs, the

method of the drug supply and transportation, the means of financing the purchase of drugs, the

precise locations where drugs and proceeds are stored, and the method of disposing of drug

proceeds." (*Id.* at ¶ 75).

   As an example of the incomplete nature of the information learned through

surveillance, Mahaffy included an excerpt from an intercepted telephone call placed on January

25, 2016 at approximately 10:44 a.m. by Smith from Target Telephone One to an unknown male

drug associate on a number previously unknown to law enforcement:

| | |
|---|---|
| Unknown Male (UM): | Hello. |
| Dennis Smith (DS): | Craig. |
| UM: | Yea. |
| DS: | I don't know if he is going to open the cabinets or not. But a, anything that don't need to be seen please put it away. |
| UM: | Ok, Ok. |
| DS: | This, motherfucker has the, the authority, the power to alert any authority if he seen anything. |
| UM: | Ok, all right, so when he come do you want me to let him in? |
| DS: | I'm on my way there. He will probably start in the basement and then walk around the house on the perimeter, because he has to do an inspection on the outside and the inside. |
| UM: | Ok. I'm pissed, unintelligible, I Gotcha yea. |
| DS: | You see what I'm saying. |
| UM: | Yeah, yeah. |
| DS: | He will not hesitate to call the motherfucking police and leave me on the scene. |

UM:                              Yep, I Gotcha ya.

(*Id.* at ¶¶ 29-30, 106).  Mahaffy indicated that approximately fifteen minutes later a surveillance

officer observed Smith leave 135 Fifth Street, Rochester, New York, a location owned by Smith.

(*Id.* at ¶ 30).  Mahaffy stated that "[a]gents ha[d] not yet been able to identify the unknown drug

associate [in the call] or confirm that Smith utilize[d] the 135 Fifth Street location to store and/or

process cocaine." (*Id.* at ¶ 106).

### B.    <u>Wiretap Warrant for 585-857-1888 (Target Telephone Two)</u>

On February 9, 2016, Judge Siragusa signed an eavesdropping warrant to

intercept electronic communications over Target Telephone Two.  Special Agent Mahaffy

submitted a sixty-two page affidavit in support of the warrant application.  ("Mahaffy Aff. 2").

Based upon another affidavit sworn by Mahaffy ("Mahaffy Aff. 2a"), on March 11, 2016, Judge

Siragusa authorized the continued interception of communications over Target Telephone Two

for an additional thirty days.[5]  Mahaffy incorporated by reference the information contained in

his affidavit for Target Telephone One into both affidavits for Target Telephone Two.  (Mahaffy

Aff. 2 at ¶ 14; Mahaffy Aff. 2a at ¶ 14).

According to Mahaffy, the subscriber for Target Telephone Two was "MJS

Insurance, 1038 Lyell Avenue, Rochester, New York, with Juan Sampel listed as a contact

name." (*Id.* at ¶ 7).  Mahaffy identified Juan Sampel, Dennis Smith, Ricardo Sampel, Angel

Sampel, FNU LNU 1510,[6] and others yet unknown, as the target interceptees.  (*Id.* at ¶¶ 4-5, 14).

---

[5]  On March 11, 2016, Judge Siragusa signed an Amended Order based on information from AT&T that the
International Mobil Subscriber Identity (IMSI) number for Target Telephone Two had been changed prior to the
issuance of the Court's March 10, 2016 order authorizing the continued interception of wire and electronic
communications on Target Telephone Two.  (Amended Extension Order; Amended Mahaffy Aff. 2a).

[6]  "FNU LNU 1510" refers to the unknown individual utilizing telephone facility 585-210-1510.  (Mahaffy
Aff. 2 at n.1).

Mahaffy listed the known criminal history of the target interceptees. (Mahaffy Aff. 1 at ¶¶ 16, 19; Mahaffy Aff. 2 at ¶¶ 14-16). All had prior convictions for criminal possession of controlled substances. (*Id.*). Mahaffy affirmed, based on the investigation to date, that the target subjects were believed to purchase approximately five to seven kilograms of cocaine every two weeks for distribution to Rochester area customers and to have several unidentified cocaine sources of supply. (Mahaffy Aff. 2 at ¶ 19). Mahaffy noted that more than 200 grams of cocaine had been purchased from Smith through controlled purchases and that surveillance had identified Sampel as Smith's supplier. (*Id.*).

Mahaffy recounted that Smith told CS1 that his cocaine supplier was a "'Spanish' male who owns a 'Farmers Insurance company' located on Lyell Avenue." (*Id.* at ¶ 20). Smith told CS1 that this person used the insurance business to "conceal cocaine shipments in automobile batteries." (*Id.*). CS1 described the location of the insurance company on Lyell Avenue, and agents identified the Farmers Insurance Company, located at 1038 Lyell Avenue, Rochester, New York, as matching Smith's description. (*Id.*). According to Mahaffy, the defendant "and his wife Miriam Sampel are the listed owners of that Farmers Insurance Company." (*Id.*). Mahaffy also stated that public records revealed that on July 7, 2010, Sampel and Miriam Sampel filed a DBA for MJS Insurance Agency, 1038 Lyell Avenue, Rochester, New York. (*Id.*).

According to Mahaffy, on January 22, 2016, at approximately 4:28 p.m., Smith received an incoming text message on Target Telephone One from Target Telephone Two, stating, "Cool I should have that for u I'll put it together now." (*Id.* at ¶ 23). At approximately 5:50 p.m., Target Telephone Two texted Target Telephone One, "Where at in 30 minutes buddy." (*Id.* at ¶ 24). Target Telephone One responded, "clubhouse." (*Id.*). Mahaffy explained

that the investigating agents had identified the "clubhouse" as an apartment in the "South Clinton Apartments" complex located at 1045 South Clinton Avenue, Rochester, New York. (*Id.*). According to Mahaffy, at 5:51 p.m., Smith, using Target Telephone One, called Sampel on Target Telephone Two, and the following conversation ensued:

| | |
|---|---|
| Dennis Smith (DS): | Hello |
| Juan Sampel (JS): | Yo Yo |
| DS: | Hey, What's up big dog? |
| JS: | Oh nothing much man, oh you know, I had to go see the man because he was having trouble with his phone in shit like that, so I will not be over in about thirty minutes. |
| DS: | All right, well shit. I'mmmmm over here, I'mmmm situated. As soon as possible would be a plus. I forgot my little man got a game at six, he just called me and shit. I need to be there in time for the game. |
| JS: | Gotcha Gotcha Gotcha you. So yea no I am just waiting on homie. |
| DS: | Ok |
| JS: | He told me thirty, so. |
| DS: | all right. |
| JS: | K |
| DS: | All right big dog. |
| JS: | All right bye. |
| DS: | Later |

(*Id.* at ¶ 25). Based on his training and experience, Mahaffy opined that in this conversation Sampel told Smith that Sampel had to visit his co-conspirator to obtain cocaine for Smith and would not be able to meet Smith in thirty minutes. (*Id.*).

At 6:13 p.m., using Target Telephone One, Smith texted Sampel on Target Telephone Two and stated, "clubhouse." (*Id.* at ¶ 26). Sampel responded, "K." (*Id.*). At 6:39 p.m., Smith texted Sampel, "u close," and Sampel responded, "yeziz." (*Id.* at ¶ 27). At 6:54 p.m., Sampel texted Smith, "Down street" and "Getting gas." (*Id.* at ¶ 28).

Mahaffy reported that investigating agents conducted surveillance in the area of 1045 South Clinton Avenue. (*Id.* at ¶ 29). At approximately 7:05 p.m., RPD Investigator

Wilfredo Carbonel ("Carbonel") observed a gray Nissan Pathfinder parked at the Valero gas station on the corner of South Goodman Street and South Clinton Avenue.  (*Id.*).  Carbonel identified the driver of the vehicle as Sampel, but was unable to identify the female passenger. (*Id.*).  According to Mahaffy, Department of Motor Vehicle records revealed that the Pathfinder was registered to Miriam Rivera, 4 Bru Mar Drive, Rochester, New York; public records revealed that Miriam Rivera was also known as Miriam Sampel and was Juan Sampel's wife. (*Id.*).

Mahaffy recounted that surveillance agents followed the Pathfinder from the gas station and observed it pull into a parking lot in front of the South Clinton Apartments at 1045 South Clinton Avenue.  (*Id.*).  Mahaffy averred that "covert video surveillance" revealed that, at approximately 7:09 p.m., Sampel

> exit[ed] the gray Pathfinder and enter[ed] the door to the South Clinton Apartments.  Moments later, Greece Police Department Investigator Brandon Goater observed the tail lights flash to Smith's white Yukon, which was unoccupied and parked in the parking lot out of view of the covert video surveillance.  At the same time, covert video surveillance was able to observe Sampel exit the South Clinton Apartments and walk past the gray Pathfinder, where Investigator Goater observed this same individual open the door to Smith's Yukon and lean inside before shutting the door and walking away.  At approximately 7:11 p.m., covert video surveillance observed Sampel walk towards the gray Pathfinder and then enter it and drive away from the location.

(*Id.*).  Mahaffy opined that Sampel met Smith inside the South Clinton Apartments and supplied him with cocaine, after which Smith unlocked the doors to his white Yukon, from which Sampel retrieved the purchase money for the cocaine before departing in the Pathfinder.  (*Id.* at ¶ 30).

In his affidavit, Mahaffy noted that although the cell phone subscriber for Target Telephone Two was listed as "MJS Insurance, 1038 Lyell Avenue, Rochester, New York," that number was not the telephone number listed on the public website for Farmers Insurance located

11

at 1038 Lyell Avenue or on other websites for MJS Insurance at 1038 Lyell Avenue.  (*Id.* at

¶ 31).  Mahaffy also noted that Target Telephone Two received incoming calls or placed

outgoing calls to 585-201-1510 on approximately twenty-four occasions between October 30,

2015 and January 31, 2016.  (*Id.* at ¶ 32).  Text messages between the two numbers were

exchanged on ninety-seven occasions.  (*Id.*).  At the time Mahaffy executed his affidavit, agents

had not received subscriber information for this telephone number.  (*Id.*).  According to Mahaffy,

the number was "prominent in the investigation because Telephone [Two] ma[de] contact with

[it] in and around the same timeframes that there [were] telephone calls and text messages

between Target Telephone [One] and Target Telephone [Two]."  (*Id.*).  For instance, Mahaffy

explained that Sampel was contemporaneously texting and calling 585-201-1510 during the

series of communications between Sampel and Smith on January 22, 2016 described above.

(*Id.*).  During a call between Sampel and Smith at 5:51 p.m., Sampel indicated, "I am just

waiting on homie" and "He told me thirty."  (*Id.* at ¶ 34).  Approximately thirty minutes later, at

6:22 p.m., Target Telephone Two received an incoming text message from 585-201-1510.  (*Id.* at

¶ 35).  At approximately 6:30 and 6:32 p.m., Target Telephone Two sent two outgoing text

message to that number.  (*Id.*).  At 6:38 p.m., Target Telephone Two received a forty-two second

call from the number.  (*Id.*).  Mahaffy opined that the user of 585-201-1510 was the "homie"

whom Sampel was waiting to meet to obtain cocaine for Smith.  (*Id.*).  Following the

"clubhouse" meeting between Smith and Sampel, Target Telephone Two and 585-201-1510

exchanged six more text messages between 7:20 p.m. and 7:52 p.m., but had no subsequent

contact that evening.  (*Id.* at ¶ 38).  Mahaffy stated that on November 2, 2015, November 20,

2015, and December 28, 2015, Target Telephone Two engaged in similar patterns of contact

with Target Telephone One and 585-201-1510.  (*Id.* at ¶ 39).

In his affidavit supporting the application for continued surveillance on Target Telephone Two, sworn to on March 10, 2016, Mahaffy summarized the evidence learned through the investigation.  (Mahaffy Aff. 2a).  Mahaffy noted that although the intercepted communications identified "Sampel as being involved in distribution of drugs with some of the Target Interceptees, including Smith . . . [,] this has yet to be confirmed."  (*Id.* at ¶ 31).  Mahaffy explained that the subjects "utilize heavily coded language to discuss their drug transaction[s]."  (*Id.*).  Likewise, intercepted communications had suggested that Angel Ocasio was the user of telephone number 585-201-1510 and a possible supplier for Sampel, "although this has yet to be conclusively determined."  (*Id.* at ¶¶ 16, 31).  Mahaffy opined that "continued interception . . . [was] necessary and [would] continue to assist in obtaining evidence to meet the goals of this investigation, including obtaining evidence sufficient to criminally prosecute all members of this drug distribution network."  (*Id.* at ¶ 31).

## C.    Wiretap Warrant for 585-503-4746 (Target Telephone Three)

On March 7, 2016, Judge Siragusa issued an eavesdropping warrant to intercept electronic communications over Target Telephone Three.  Mahaffy submitted an eighty-two page affidavit in support of the warrant application.  ("Mahaffy Aff. 3").  Mahaffy incorporated the information contained in his affidavits for Target Telephones One, Two, Four and Five.  (*Id.* at ¶¶ 14, 19).  Mahaffy listed Kaleaf Ball, Dennis Smith, Darren Smith, Demetrius Gibson, and others yet known, as the target interceptees of this wiretap.  (*Id.* at ¶ 14).  He noted that each target had prior arrests and convictions for drug-related charges.  (*Id.* at ¶ 15; Mahaffy Aff. 1 at ¶¶ 16-18).

Mahaffy stated that Target Telephone Three was subscribed to "Big Dude, 1084 South Laurel Road, London, Kentucky 40744," although "Kaleaf Ball [was] believed to be the

actual user." (Mahaffy Aff. 3 at ¶ 7). Mahaffy identified Target Telephone Three "as a telephone that Ball use[d] to communicate with his co-conspirators about drug trafficking activities." (*Id.* at ¶ 19). Mahaffy explained that this determination was based, in part, on information that Ball gave CS5 that telephone number to use to contact Ball for cocaine purchases. (*Id.* at ¶ 21 n.5; *see supra*.). In addition, Mahaffy reported that during conversations between Target Telephone One and Target Telephone Three, Smith referred to the user of Target Telephone Three as "Kaleaf" and "Leaf," "a nickname utilized by Kaleaf Ball." (*Id.*).

Mahaffy's affidavit included excerpts of intercepted text messages and telephone conversations relating to drug dealing between and among Target Telephones One, Two, and Three. (*Id.* at ¶¶ 22-62). For example, Mahaffy described communications between Ball and Smith, and Smith and Sampel, that occurred throughout the day on February 2, 2016. (*Id.* at ¶¶ 22-34). Based on his training and experience, Mahaffy opined that Smith contacted Sampel to obtain cocaine for Ball, but Ball was unable to complete the transaction at that time because he was with his child and was unable to collect the money needed to purchase cocaine. (*Id.* at ¶ 26). Smith texted Ball, "I got half on one"; according to Mahaffy, Smith was letting Ball know that when Ball received his two kilograms of cocaine from Smith's supplier (Sampel) that Smith wanted one half of a kilogram to sell himself. (*Id.* at ¶ 27). Smith then received a call from Sampel communicating that he was ready to conduct the transaction (*id.* at ¶¶ 28-29); when Smith called Ball, however, Ball indicated that he was waiting to hear from his customers and would know for sure the following day if he needed the drugs (*id.* at ¶¶ 30-31). Smith called Sampel back and said that Ball was "still waiting from somebody to put it together, man," and apologized for Ball not being "ready." (*Id.* at ¶ 32). At 7:42 p.m., Sampel texted Smith, "Got the parts for furnace tomorrow," which, in Mahaffy's estimation, was a coded communication

advising Smith that Sampel got permission from his cocaine source to keep the cocaine overnight.  (*Id.* at ¶ 34).

The following day, February 3, 2016, Ball told Smith that he did not need the cocaine, which Smith relayed to Sampel.  (*Id.* at ¶¶ 35-37).  Smith told Sampel that if Sampel's supplier "wanna give me the licks[,] we gonna take it."  (*Id.* at ¶ 36).  Mahaffy explained that Smith told Sampel that Smith would take the two kilograms of cocaine and sell it for Sampel's supplier.  (*Id.* at ¶ 37).  During an intercepted telephone call between Smith and Sampel at 4:31 p.m. that day, Sampel agreed to meet Smith at the clubhouse in "an hour or so" to give him the two kilograms of cocaine.  (*Id.* at ¶¶ 38-39).

According to Mahaffy, covert video surveillance showed that Sampel's gray Pathfinder pulled into the parking lot of 1045 South Clinton Avenue and Sampel entered the South Clinton Apartments at approximately 5:01 p.m.  (*Id.* at ¶ 40).  "At approximately 5:02 p.m., Sampel exited the South Clinton Apartments, went to the gray Pathfinder and then returned back to the door of the South Clinton Apartments carrying a dark colored bag."  (*Id.*).  Sampel left the apartments and drove away at approximately 5:04 p.m.  (*Id.*).  At 5:06 p.m., Smith called Ball and, as Mahaffy recounted the conversation, told Ball that "he just came and said well fuck it man, just give it to me when you get it."  (*Id.* at ¶ 41).  Ball replied, "ain't that a motherfucker, come on man let me get one of them for the workspace man."  (*Id.*).

A similar series of communications occurred between Sampel, Smith and Ball on February 8, 2016, which, according to Mahaffy, resulted in Sampel selling Smith another quantity of cocaine to give to Ball.  (*Id.* at ¶¶ 43-62).

Mahaffy recounted information obtained from toll records data for Target Telephone Three.  (*Id.* at ¶¶ 63-67).  Mahaffy explained that between October 1, 2015 and

February 17, 2016, 118 calls were placed to or received from 585-709-4730, a number listed to Darren Smith, "an active co-conspirator within [Dennis] Smith's narcotics trafficking organization." (*Id.* at ¶ 64). Mahaffy explained that agents had "intercepted drug-related communications between Darren Smith and [Dennis] Smith on multiple occasions." (*Id.* at ¶ 65). Mahaffy also stated that during the same time period, Target Telephone Three communicated with 585-766-7541 on approximately 447 occasions. (*Id.* at ¶ 66). Mahaffy affirmed that this number was registered to Demetrius Gibson, who was "recently released from parole in connection with [a] cocaine conviction in October 2014." (*Id.* at ¶¶ 66-67). The most recent communication between Target Telephone Three and Gibson's telephone occurred on February 17, 2016. (*Id.* at ¶ 67).

Based on the evidence summarized in his affidavit, Mahaffy opined that Ball was purchasing cocaine from Smith. (*Id.* at ¶ 104). According to Mahaffy, the content of communications and "precise relationship between Ball and Darren Smith and their exact roles in this drug conspiracy [would] not be known absent interception of communications on Target Telephone 3." (*Id.* at ¶ 108). Mahaffy also stated that he expected to identify "locations and vehicles utilized by Ball and others to store cocaine[,] . . . the methods by which Ball and others obtain[ed] cocaine, process[ed] and distribute[d] cocaine, . . . [and] any alternate sources [of] cocaine utilized by this organization." (*Id.*).

**D.** **Wiretap Warrant for 585-201-1510 (Target Telephone Four) and 585-524-8457 (Target Telephone Five)**

On March 7, 2016, Judge Siragusa issued an eavesdropping warrant to intercept electronic communications over Target Telephones Four and Five. Mahaffy submitted a ninety-page affidavit in support of the warrant application. ("Mahaffy Aff. 4"). Mahaffy

incorporated the affidavits in support of the orders granting interception of Target Telephones One, Two, and Three.  (*Id.* at ¶ 15).

Mahaffy identified Angel Ocasio as the user of Target Telephones Four and Five. (*Id.* at ¶¶ 7-8).  According to Mahaffy, Ocasio was the listed subscriber for Target Telephone Four, but Target Telephone Five had no listed user.  (*Id.*).  The target interceptees were Angel Ocasio, Jose Quintana, and Juan Sampel.  (*Id.* at ¶ 15).  Mahaffy noted that Ocasio had no drug-related criminal history, but that law enforcement agents believed he was "involved in distribution of cocaine to others in this narcotics trafficking conspiracy."  (*Id.* at ¶ 16).  In February 2016, another confidential source, CS6, identified Quintana as the brother of Ocasio and reported that the two were "distributing approximately 40 kilograms of cocaine per week and [were] smuggling the cocaine to Rochester from an unknown out of state supplier utilizing tractor trailers."  (*Id.* at ¶ 17).  In his affidavit, Mahaffy also stated that, according to CS6, "Ocasio and Quintana stash large amounts of cocaine and drug proceeds at 35 Oakman Street, Rochester, New York."  (*Id.*).  The Oakman Street address was listed on Quintana's New York State driver's license.  (*Id.*).

Mahaffy included excerpts of communications intercepted over Target Telephone Two between February 12 and 24, 2016 that implicated Target Telephones Four and Five in drug activity.  (*Id.* at ¶¶ 23-70).  For example, Mahaffy documented multiple text messages on February 12, 2016, between Sampel and Ocasio (on Target Telephone Four) coordinating the pick-up of a quantity of cocaine.  (*Id.* at ¶¶ 24-51).  Mahaffy described that Sampel also exchanged text messages and telephone calls throughout that day with Dennis Smith on Target Telephone One discussing the quantity of cocaine Smith wanted Sampel to obtain from Ocasio. (*Id.*).  Smith texted Sampel at 4:44 p.m., "I can take care of one but ill [sic] take whatever,"

which Mahaffy opined meant that Smith had enough money to purchase only one kilogram of cocaine but would take more if Sampel's source fronted the cocaine to Smith.  (*Id.* at ¶ 30). Sampel responded, "K."  (*Id.*).  Sampel then texted Target Telephone Four, "He available to do one room right now he ok if u want him to help do him whatever," to which Ocasio responded, "OK hold on."  (*Id.* at ¶ 31).  After a few more text messages coordinating a time for the pick-up, at 5:09 p.m., Target Telephone Four texted Sampel, "OK it set me back a little cause had to go get more dry wall he needs."  (*Id.* at ¶ 34).  Mahaffy opined that Ocasio was telling Sampel that he had to go get more cocaine because he did not have enough for Sampel to give to Smith. (*Id.*).  According to Mahaffy, at 5:13 p.m., Sampel received a text message from Target Telephone Four stating, "but [sic] 30 mind [sic] waiting on my bro so we can pick up the dry wall in his truck."  (*Id.* at ¶ 35).  Sampel then texted Smith, "Getting paint supplies together I'll call u."  (*Id.* at ¶ 36).  At 5:29 p.m., Target Telephone Four texted Sampel, "6pm be there ok." (*Id.* at ¶ 37).  At 6:27 p.m., Sampel texted to Target Telephone Four, "2 min"; at 6:30 p.m., he texted, "here."  (*Id.* at ¶¶ 41-42).  Approximately ten minutes later, Sampel told Smith during a phone call, "Yeah, I was just driving by the park over here looking at the snow and I see your vehicle parked at the mansion, you heard?"  (*Id.* at ¶ 44).  Smith replied, "Nah, I'm up at the clubhouse, my girl car ain't working right, so, I let her keep my truck."  (*Id.*).  Sampel replied, "Okay that's a beautiful thing, no problem I was just checking because you know I just um, I got that equipment with me so that way you can do that job tomorrow morning but, I be there in a few I will call you when I am close."  (*Id.*).  Mahaffy opined that Sampel told Smith that he had the cocaine on him, and Smith told Sampel to come to the South Clinton Apartments (the "clubhouse").  (*Id.*).  At 7:18 p.m., Sampel told Smith that he was on his way.  (*Id.* at ¶ 45).  At 7:40 p.m., Sampel called Target Telephone Four, and Ocasio told Sampel to "go to Family

18

Dollar right there on Dewey and Driving Park" to meet Ocasio's wife. (*Id.* at ¶ 46). Mahaffy opined that the purpose of that call was to make arrangements for Sampel to give Ocasio the money from Smith for the cocaine. (*Id.*).

Mahaffy's affidavit described various surveillance observations of Sampel and Quintana during the above-referenced time frame. (*Id.* at ¶¶ 47-50). Sampel's gray Nissan Pathfinder left his residence, 4 Bru Mar Drive, Rochester, New York, at 6:18 p.m., and drove to 425 Lakeview Park, Rochester, New York, Ocasio's residence. (*Id.* at ¶¶ 7, 47). Sampel entered 425 Lakeview Park; at the same time, a 2007 Ford F-150 XLT registered to Jose Luis Quintana was idling in front of 425 Lakeview. (*Id.* at ¶ 47). At 6:39 p.m., agents observed Sampel's vehicle leave 425 Lakeview, and GPS tracking showed him near Smith's residence at 6:43 p.m., before returning home to 4 Bru Mar Drive. (*Id.* at ¶¶ 48-49). At 7:18 p.m., Sampel's vehicle again left his residence and, at 7:28 p.m., agents observed the vehicle park at the South Clinton Apartments and Sampel enter the building. (*Id.* at ¶ 49). Agents saw Sampel depart the area at 7:29 p.m. (*Id.*). GPS tracking and visual surveillance confirmed Sampel's presence at the Family Dollar parking lot at the corner of Dewey Avenue and Driving Park at 7:53 p.m., where he stayed for approximately one minute. (*Id.* at ¶ 50).

Based on additional intercepted communications on February 17, 22, 23 and 24, 2016, Mahaffy opined that Ocasio used Target Telephones Four and Five to coordinate cocaine transactions with Sampel. (*Id.* at ¶¶ 51-70).

Mahaffy reviewed data collected from pen registers for Target Telephones Four and Five. (*Id.* at ¶¶ 71-74). Between February 10 and 25, 2016, Target Telephone Two communicated forty-seven times with Target Telephone Four and forty-seven times with Target Telephone Five. (*Id.* at ¶ 71 n.6). Target Telephones Four and Five also communicated

frequently with 585-939-5548, a number subscribed by Caroline Rivera, 35 Oakman Street, Rochester, New York, Jose Quintana's sister. (*Id.* at ¶¶ 72-74). CS6 identified that telephone number and address as contact information for Quintana. (*Id.*). Mahaffy stated that CS6 "learned that Quintana and Ocasio [were] distributing significant amounts of kilograms [of cocaine] each week and [were] involved in smuggling the cocaine to Rochester from an unknown out of state supplier utilizing tractor trailers." (*Id.* at ¶ 74). Mahaffy stated that records confirmed that the Tan Ford F-150 that was observed in front of Ocasio's residence on February 17, 2016 was registered to Quintana. (*Id.*).

Mahaffy indicated that although the wiretaps to date had yielded evidence of criminal activities, the intercepted communications had not yet provided sufficient evidence to meet all the goals of the investigation. (*Id.* at ¶ 76). For example, although electronic surveillance had enabled the investigating agents to identify Ocasio as the user of Target Telephone Four and a participant in the distribution of drugs, Mahaffy stated that interception of communications over Target Telephones Four and Five would permit the agents to confirm "Ocasio's role as a cocaine supplier for Sampel and identify[] the ultimate source of cocaine being supplied to this drug organization." (*Id.*).

**E.    Warrants for Continued Interception of Telephones One, Two, Four and Five**

On April 6, 2016, Judge Siragusa issued an eavesdropping warrant to extend electronic interception over Target Telephones One, Two, Four and Five.[7] Mahaffy submitted a 106-page affidavit in support of the warrant application. ("Mahaffy Aff. 1c"). Mahaffy incorporated therein the information contained in his affidavits accompanying all prior warrants

---

[7] The warrant also authorized interceptions of communications over two additional numbers, identified as Target Telephones Six and Seven. The government has represented that it does not intend to use any evidence obtained from those wiretaps. (*See* Docket # 149).

for Target Telephones One through Five. (*Id.* at ¶ 14). Mahaffy identified Dennis Smith, Darren Smith, Kaleaf Ball, Juan Sampel, Thomas V. Taliento, Reginald L. Streeter, Donde Lindsay, FNU LNU 0739, FNU LNU 6491, TOM LNU, FNU LNU 1195, George McFadden, Ricardo Sampel, Angel Sampel, Angel Ocasio, FNU LNU 5322, FNU LNU 9692, Jose Quintana, Luz Morales, FNU LNU 8558, FNU LNU 8275, FNU LNU 5296 as the target interceptees. (*Id.* at ¶¶ 14-16).

   Mahaffy noted that in the course of intercepting communications over Target Telephones One, Two, Four and Five, "agents ha[d] begun to identify codes utilized by Sampel and Smith and Sampel and Ocasio to discuss cocaine transactions." (*Id.* at ¶ 28). Mahaffy explained that interception of Target Telephone One had "allowed agents to begin to identify further individuals involved in Smith's distribution network, as well as a new location Smith [might] be using for drug activities." (*Id.*). Intercepted communications over Target Telephones Two, Four and Five had led to identification of other telephone numbers used by the conspirators. (*Id.*). Mahaffy included excerpts of conversations intercepted from Target Telephones One, Two, Four and Five that he asserted implicated Smith, Sampel, and Ocasio, and others, in drug transactions. (*Id.* at ¶¶ 30-78).

   Mahaffy's affidavit stated that evidence obtained from Target Telephones Four and Five, Ocasio's telephones, led agents to "believe that [Luz] Morales was involved in sending packages containing cash proceeds from the sale of cocaine to Puerto Rico via USPS for cocaine shipments that [were] being sent to Ocasio for distribution." (*Id.* at ¶ 57).

   Mahaffy noted that "while the investigation to date ha[d] certainly developed some evidence against Smith, Sampel, Ocasio and others, the full scope of the members of this drug trafficking organization ha[d] not yet been fully identified." (*Id.* at ¶ 115). The affidavit

continued, "[m]oreover, a full understanding of the drug relationship between Smith, Sampel, Ocasio, Quintana, these other newly identified co-conspirators and the other Target Subjects has not been accomplished."  (*Id.*).  Although the investigating agents had "initiated a financial investigation into Sampel's financial records and ha[d] utilized subpoenas to identify and obtain various bank records associated with Sampel and his business" (*id.* at ¶ 146), Mahaffy affirmed that interception of electronic communications "appear[ed] to be the only means to determine this information" (*id.* at ¶ 115).


## II.    <u>Warrant Authorizing GPS Tracking</u>

On February 9, 2016, this Court signed a warrant authorizing the installation and monitoring of a GPS Tracking Device on a 2006 Nissan Pathfinder ("subject vehicle").  Sabatino Smith ("SA Smith"), a special agent with the U.S. Drug Enforcement Agency ("DEA"), submitted an affidavit in support of the application for the tracking device.  ("Smith Aff." (Docket # 165)).  SA Smith's affidavit described the information from CS1 about Dennis Smith's cocaine source – a "Spanish male" who owned a Farmers Insurance Company on Lyell Avenue – that was described in Mahaffy's affidavit in support of the wiretap application for Target Telephone Two.  (*Id.*).  SA Smith's affidavit also included the allegations about the communications between Target Telephones One and Two on January 22, 2016, and the subsequent surveillance at the Valero gas station and South Clinton Apartments (described more fully *supra*).  (*Id.*).

### III.    Search Warrant for 4 Bru Mar Drive

On April 29, 2016, Judge Siragusa issued a warrant to search Sampel's residence, 4 Bru Mar Drive, Rochester, New York, based upon a 181-page affidavit sworn by Mahaffy.[8] ("Mahaffy Search Warrant Aff." (Docket # 165)).  Mahaffy stated that he was personally involved in the investigation of Sampel and his co-conspirators and was familiar with information provided by confidential informants, interception of wire and electronic communications on six telephones, pen registers and subpoenaed tolls and other records, analysis of documents and records obtained by law enforcement, and GPS tracking of multiple vehicles. (*Id.* at ¶ 7).

Mahaffy's affidavit stated that CS1 had been communicating with the investigating agents since mid-2014.[9]  (*Id.* at ¶ 18).  Mahaffy described the information that CS1 had provided the agents about CS1's knowledge of Dennis Smith's involvement in cocaine sales (summarized *supra*) and CS1's controlled purchases from Smith.  (*Id.* at ¶¶ 18-20, 22b, 23-32).

According to Mahaffy, Smith told CS1 that he "ha[d] a cocaine source of supply that is a 'Spanish' male who owns a 'Farmers Insurance Company' located on Lyell Avenue." (*Id.* at ¶ 21).  Smith described where the business was located on Lyell Avenue and told CS1 that the business was used to conceal cocaine shipments in automobile batteries.  (*Id.*).  Mahaffy asserted that "Farmers Insurance Company, located at 1038 Lyell Avenue, Rochester, New York, is the only business matching the description provided by CS-1.  Juan Sampel and his wife Miriam Sampel are the listed owners of that Farmers Insurance Company."  (*Id.*).

---

[8]  The affidavit also supported warrants authorizing the search of nine other premises and eight vehicles. (Docket # 165).

[9]  According to Mahaffy, CS1 was a cooperating defendant who had pleaded guilty to violating 21 U.S.C. § 846, and was cooperating with the government in exchange for consideration at sentencing.  (*Id.* at ¶ 19). According to Mahaffy, CS1 had previously provided reliable information related to narcotics trafficking, which had been independently corroborated and had led to controlled purchases of controlled substances.  (*Id.* at ¶ 18).

Mahaffy's affidavit stated that the investigating agents determined through physical surveillance, public records databases, and other investigative techniques that Sampel resided at 4 Bru Mar Drive, Rochester, New York.  (*Id.* at ¶ 125).  According to Mahaffy, Rochester Gas and Electric records showed that utilities at 4 Bru Mar Drive had been registered to Miriam Rivera since April 8, 2013.  (*Id.*).  Records from the Monroe County Clerk's Office showed that Miriam Rivera purchased 4 Bru Mar Drive in April 2013.  (*Id.*).  Mahaffy noted that Rivera was the owner of two vehicles ("Vehicle 2" and "Vehicle 4") known to be used by Sampel.  (*Id.* at ¶¶ 125, 129).  Mahaffy affirmed that public databases identified Miriam Rivera, also known as Miriam Sampel, as Sampel's wife.  (*Id.* at ¶ 125).

Mahaffy stated that "Sampel ha[d] been observed by members of the investigative team operating Vehicle 2 on a regular basis to transport cocaine and cash drug proceeds."  (*Id.* at ¶ 129).  Mahaffy stated that Vehicles 2 and 4 had been observed parked at 4 Bru Mar Drive on a regular basis, most recently on April 22, 2016 (Vehicle 4) and April 25, 2016 (Vehicle 2).  (*Id.*).

Mahaffy's affidavit described intercepted wire and electronic communications on three different dates revealing Sampel's involvement in the ongoing conspiracy to distribute cocaine.  (*Id.* at ¶¶ 133-59).  Mahaffy further indicated that there were "multiple other dates during this investigation" on which similar communications were intercepted.  (*Id.* at ¶ 132).  Mahaffy noted that Smith used Target Telephone One (585-733-9383), Sampel used Target Telephone Two (585-857-1888), and co-defendant Angel Ocasio ("Ocasio") used Target Telephones Four (585-201-1510) and Five (585-524-8457).  (*Id.* at ¶¶ 9, 132).

### A.    <u>February 17, 2016</u>

At approximately 5:14 p.m. on February 17, 2016, Sampel texted Smith, "So how many jobs should I tell the company u have situated so they no how much material they need to

give u for the next job." (*Id.* at ¶ 133). Smith responded, "what I owe plus one," and Sampel

replied, "Got u I'll see what's up now." (*Id.*). Mahaffy opined that Sampel was asking Smith

how much cocaine Smith had sold and how many kilograms of cocaine Smith needed for

re-supply. (*Id.*). Smith's response indicated that he had the money for one kilogram of cocaine

that had been fronted to him and wanted an additional kilogram. (*Id.*). Sampel confirmed that he

understood and would contact his supplier. (*Id.*).

      At 5:40 p.m., Sampel called Ocasio, and the following conversation was

intercepted:

| | |
|---|---|
| Angel Ocasio (AO): | Yeah. |
| Juan Sampel (JS): | How are you doing, buddy? |
| AO: | All right. |
| JS: | Oh shit, I got, I got the call man. You heard, and um, he was telling me that he did, he did the job for your apartment, you know, and um, they did, he did another job so, you know. I was just letting you know that he wanted whatever you want to do, I am just saying, we can, we do, we going, we going too fast. |
| AO: | (Laughing) |
| JS: | You know what I am saying, so. Whatever, whatever you going to do, I mean he's, he's set, but you know. He's, he's got enough jobs right now, but he's just not giving them enough time that you know, but whatever you want to do he is still going to put you first anyway so. He already took two. He already, he got, he got your job done, and he took care of another job. So he is ready for that one so, but you know whatever you want to do it don't matter. |
| AO: | (Unintelligible) |
| JS: | Oh, that, that, the, the, you know the apartment that you had him paint all ready. |
| AO: | Yeah. |
| JS: | That apartment you had paint, that you gave, that you let him do the other day, well he did that. |
| AO: | Ok. |
| JS: | And, he did another one. So, you know he's, he's only, he's only going to be able to do one for you right now you know what I am saying, because he's still, he's still good right now you know what I am saying, but a like I |

|        | said he's willing to help you do some, do some work for you so.  Like I said whatever you want to do, if you want to do the thing you did last, you want to give him the same work you give him the last time so.  He's good at electric so.  He's good at electrical work so. |
|--------|------|
| AO:    | Ok.  |
| JS:    | You know that. |
| AO:    | Ok I will call you in a few. |
| JS:    | Yea, Ok. |
| AO:    | Bye. |

(*Id.* at ¶ 134).  According to Mahaffy, in this conversation, Sampel told Ocasio that Smith had sold two kilograms of cocaine since Ocasio had last supplied Smith through Sampel.  (*Id.* at ¶ 135).  Sampel then told Ocasio that if Ocasio wanted to provide Smith the same amount of cocaine, Smith would be able to sell it.  (*Id.*).  At 6:40 p.m., Ocasio texted Sampel, "Where u at pa.  I have the paint for the other house."  (*Id.* at ¶ 136).  Mahaffy opined that Ocasio told Sampel that he had a kilogram of cocaine for Smith.  (*Id.*).  At 6:55 p.m., Sampel texted Smith, "30m."  (*Id.* at ¶ 137).  Smith responded, "club got a game at 8."  Mahaffy explained that Sampel told Smith that he would be able to meet him in thirty minutes with the cocaine, and Smith replied that he would meet him at the clubhouse.  (*Id.*).

At 7:20 p.m., Sampel texted Ocasio, "On w."  (*Id.* at ¶ 138).  Ocasio responded "K."  (*Id.*).  Shortly thereafter, Sampel texted, "Here."  (*Id.*).  At 7:27 p.m., Sampel texted Smith, "On wa."  (*Id.* at ¶ 139).  Mahaffy indicated that a covert surveillance camera observed Vehicle 2 (Sampel's gray Pathfinder) pull into the parking lot adjacent to "the clubhouse" at 1045 South Clinton Avenue at 7:47 p.m.  (*Id.*).  GPS tracking showed that Vehicle 2 and Smith's Yukon were "located in the vicinity" of the clubhouse.  (*Id.*).  Monitoring agents observed Vehicle 2 depart at approximately 7:53 p.m.  (*Id.*).

At 7:49 p.m., Ocasio texted Sampel, "Call me when on your way."  (*Id.* at ¶ 140).  At 8:03 p.m., Sampel called Ocasio, and the following conversation occurred:

| | |
|---|---|
| Angel Ocasio (AO): | Yeah. |
| Juan Sampel (JS): | Hey, it's, you, you leaving anywhere? |
| AO: | No, no, no. |
| JS: | Alright, I didn't know if you wanted to come out for a minute or something. |
| AO: | No, I just, text me when you on your way. |
| JS: | Yeah, yeah, no cuz I a, umm, I got that umm, I got the panel box that I, the panel box for you. |
| AO: | Ok. |
| JS: | You know what I am saying, I got the panel box so, so we can install it, to umm.  During the summer time we can upgrade it.  You know what I am saying. |
| AO: | Ok. |
| | *** |
| AO: | Alright, but I am here. |
| JS: | Yeah, no problem. |

(*Id.* at ¶ 141).  According to Mahaffy, Sampel told Ocasio that he had completed the cocaine transaction with Smith and was on his way to Ocasio's residence with the purchase money.  (*Id.* at ¶ 142).  The investigating agents observed Sampel's gray Pathfinder parked in the driveway of Ocasio's residence at 8:15 p.m.  (*Id.*).  Based on his training and experience, Mahaffy affirmed that on February 17, 2016, Sampel obtained a quantity of cocaine from Ocasio at his house at 425 Lakeview Park, transported the cocaine to Smith at 1045 South Clinton Avenue, and then returned to Ocasio's house to give Ocasio the money that Sampel had received from Smith for the cocaine.  (*Id.* at ¶ 143).

## B. February 22-24, 2016

On February 22, 2016, at approximately 7:42 a.m., Sampel received a text from Smith, "in the am +1 got it xtra is always plus."  (*Id.* at ¶ 144).  Mahaffy opined that "Smith was informing Sampel that he wanted one kilogram of cocaine but would take additional kilograms if they are available."  (*Id.*).  Later that day, at 6:12 p.m., Sampel texted Ocasio, "The landlord called."  (*Id.* at ¶ 145).  Ocasio responded at 7:01 p.m., "Yo what the landlord said about the

room." (*Id.*). At 8:03 p.m., Sampel responded, "Tomorrow same job as last week urs plus 1 and whatever u want to do." (*Id.*). Mahaffy opined that Sampel informed Ocasio that Smith wanted to purchase the same amount of cocaine that he had purchased the previous week, plus any other quantity that Ocasio would agree to provide on consignment. (*Id.*).

The next day, at approximately 5:20 p.m., Sampel called Smith. (*Id.* at ¶ 146). Sampel asked, "So you did, did the umm, you did the breaker panel installation all ready for this guy?" (*Id.*). Smith replied, "Yes." (*Id.*). Sampel then inquired, "[Y]ou finished another breaker panel also?" (*Id.*). Smith replied, "Oh shit, ummm, I got, got the old and a two new." (*Id.*). Sampel then advised Smith that he would "work on it" and that he would see Smith "in a few." (*Id.*). Mahaffy opined that Sampel asked Smith if he had the money for the cocaine purchase, and Smith responded affirmatively. (*Id.*). Sampel asked Smith how much cocaine he wanted to purchase, and Smith requested three kilograms. (*Id.*).

At 5:22 p.m., Sampel called Ocasio:

| | |
|---|---|
| Angel Ocasio (AO): | Yeah. |
| Juan Sampel (JS): | Hey buddy, what's going on man? |
| AO: | I'll text you in a few. |
| JS: | Yeah, no he can, I just want to let you know that umm, my man he installed, he installed the breaker panel for you. The one you have him to install, and he had two more to install, that he is almost finished with right now. |
| AO: | Ok, so…. You got me all fucked up. |
| JS: | (Laughing) Three n*****. |
| AO: | He did, he got three breaker panels, two installed. One, one was the one that you, you had him do. And, and he had the other two for you. |
| AO: | Ok, he got another two. |
| JS: | Yeah, yeah. |
| AO: | Ok. |
| JS: | Ok, so whatever, just call me I'm, I really don't wanna go home and take a shower or nuttin, but. |

| AO: | I'm waiting on somebody, I'm waiting on somebody, so I will text you soon, it going to be short right now.  By, by six o'clock. |
| JS: | Yeah, ok, no problem sounds great. |
| AO: | Ok I'll text you. |

(*Id.* at ¶ 147).  Mahaffy opined that Sampel informed Ocasio in coded language that Smith

wanted to purchase three kilograms of cocaine, but Ocasio could not understand the code.  (*Id.* at

¶ 148).  Ocasio's difficulties prompted Sampel to laugh and state explicitly that Smith wanted

three.  (*Id.*).  Ocasio confirmed that he understood the quantity of cocaine that Smith wanted to

purchase.  (*Id.*).

      At 7:18 p.m., Sampel texted Ocasio, "Yo 1min here."  (*Id.* at ¶ 149).  Surveillance

agents observed Vehicle 2 (Sampel's gray Pathfinder) depart his residence at 4 Bru Mar Drive at

7:10 p.m. and drive to Ocasio's residence at 425 Lakeview Park.  (*Id.* at ¶ 150).  Three minutes

after arriving at Ocasio's house, Vehicle 2 departed and returned to 4 Bru Mar Drive.  (*Id.*).  At

approximately 9:30 p.m., agents observed Smith's white Yukon arrive at the parking lot near the

South Clinton Apartments.  (*Id.*).  Six minutes later, Sampel arrived in Vehicle 2 and parked in

the same parking lot; Sampel exited his vehicle carrying a bag and walked toward the entrance of

1045 South Clinton.  (*Id.*).  At approximately 9:57 p.m., agents observed Sampel and Smith exit

the area, and Vehicle 2 left the parking lot.  (*Id.*).

      At 10:04 p.m., Sampel called Ocasio and stated, "I didn't know if you want to

come over to my house and pick up the tools or not you can pick up the the you can pick the

tools from my wife at work cause she's got a policy for you anyway some paperwork for you for

sure."  (*Id.* at ¶ 151).  Ocasio responded, "Yeah, yeah and I got to pay the insurance too Ok.  Just

have that do that then."  (*Id.*).  According to Mahaffy, Sampel asked Ocasio if Ocasio wanted to

pick up the money from the cocaine sale that evening at Sampel's house (4 Bru Mar Drive) or

the next day from Sampel's wife's at the insurance office located at 1038 Lyell Avenue, Rochester, New York.  (*Id.* at ¶ 152).  Ocasio stated that he would pick it up the following day. (*Id.*).

The next day, February 24, 2016, at approximately 1:54 p.m., a covert surveillance camera detected a vehicle arrive and park in front of the insurance company at 1038 Lyell Avenue, Rochester, New York.  (*Id.* at ¶ 153).  As described by Mahaffy, "a male wearing a hat and hooded sweatshirt matching the physical description of Ocasio, who was the sole occupant of the vehicle, exited [the vehicle] and then entered the insurance company.  (*Id.*).  At approximately 2:12 p.m., the man exited the insurance company carrying a box and departed the area.  (*Id.* at ¶ 153).  Based upon his training and experience, Mahaffy opined that between February 22 and 24, 2016, Sampel obtained three kilograms of cocaine from Ocasio at 425 Lakeview Park and took the cocaine to his residence located at 4 Bru Mar Drive.  (*Id.* at ¶ 154). That same evening, Sampel transported the cocaine to Smith at 1045 South Clinton, and returned to 4 Bru Mar Drive with the proceeds from that sale.  (*Id.*).  The following day, Ocasio picked up the proceeds from the cocaine sale at 1038 Lyell Avenue.  (*Id.*).

C.    **March 26, 2016**

On March 26, 2016, at 11:29 a.m., Smith called Sampel, and the following conversation occurred:

| | |
|---|---|
| Juan Sampel (JS): | Yo mister.  What's up?  I was just on my way to the park over here. |
| Dennis Smith (DS): | Huh? What did you say? |
| JS: | Uhh, I was just on my way over here, to the Glide, to the park over there.  Watch the kids play football or whatever. |
| DS: | Uhh, well (unintelligible) I'm home.  You heard me? |
| JS: | What happened? |
| DS: | I said I'm home. |
| JS: | You are? |

|     |     |
| --- | --- |
| DS: | Yeah. |
| JS: | I'll be right there. |
| DS: | Ok. |

(*Id.* at ¶ 155). Mahaffy opined that Sampel used coded language to inform Smith that Sampel was on his way to Smith's residence. (*Id.* at ¶ 156). Smith confirmed to Sampel that he was at home, 1076 Glide Street, Rochester, New York. (*Id.*). At 11:34 a.m., Sampel texted Smith, "Here." (*Id.* at ¶ 157). Investigator Pearce observed Sampel arrive at 1076 Glide Street in a Hyundai Sonata. (*Id.*). Pearce observed Sampel enter the residence at 11:38 a.m. and exit at 11:47 a.m., "carrying an undetermined object." (*Id.*).

At 11:49 a.m., Sampel texted Ocasio, "On way to ur house." (*Id.* at ¶ 158). Pearce observed Sampel arrive at 425 Lakeview Park, Ocasio's house. (*Id.*). Pearce observed Sampel walk to the front door with a shoebox under his arm. (*Id.*). Sampel knocked on the door and then used his cell phone. (*Id.*). At 11:57 a.m., a call was placed from Sampel's telephone to Ocasio's, which went unanswered. (*Id.*). At 12:02 p.m., Sampel returned to his vehicle with the shoebox and departed. (*Id.*). Mahaffy opined that Sampel had picked up money from Smith to purchase cocaine from Ocasio. (*Id.* at ¶ 159).

## IV.     **Identification Hearing**

On November 6, 2017, this Court conducted a hearing on Sampel's motion to suppress identification testimony. (Docket ## 162, 163). The government called one witness, Rochester Police Department Investigator Wilfredo Carbonel, Jr. ("Carbonel").[10] Carbonel testified that on January 22, 2016, he conducted surveillance as part of an investigation relating to Sampel. (Tr. 15). At the beginning of his shift that day, at approximately 2:00 p.m., Carbonel

---

[10] The transcript of the evidentiary hearing shall be referred to as "Tr." (Docket # 163).

was provided a photograph of Sampel.  (Tr. at 23; Government's Exhibit ("G. Ex.") 1).
Carbonel testified that he had not previously seen any photographs of Sampel or had any
interactions with him.  (Tr. 15-16, 25).

   Carbonel testified that he began surveillance at approximately 7:05 p.m. in the
vicinity of 1045 South Clinton Avenue, Rochester, New York.  (Tr. 20).  Carbonel testified that
between 2:00 p.m., when he was given the photograph, and 7:05 p.m., when he began
surveillance, he "recall[ed] looking at the photograph," but could not recall "how many times
[he] looked at the photograph."  (Tr. 23).  As Carbonel put it, "It was in the room and I was in
the room."  (Tr. 22).  When asked if he looked at the photograph for five hours, Carbonel
answered, "No."  (Tr. 23).  Eventually, Carbonel testified that he looked at the photograph "a
couple times."  (Tr. 24).  He was unsure if he looked at any other photographs that day.  (Tr. 22).

   Carbonel commenced surveillance at the Valero gas station on the corner of South
Goodman Street and South Clinton Avenue, "right down the street" from 1045 South Clinton.
(Tr. 25).  Carbonel parked his vehicle, an unmarked police vehicle with tinted windows, in the
gas station parking lot.  (Tr. 26).  Carbonel was alone in his vehicle, although another officer was
conducting surveillance nearby.  (Tr. 24, 29).

   Through his front windshield, Carbonel observed Sampel standing next to
Sampel's vehicle in the gas station.  (Tr. 27, 36).  Carbonel stated that he did not see Sampel
arrive at the gas station, and believes that Sampel arrived there before he did.  (Tr. 29).  Carbonel
could not remember if any vehicles were located between his and Sampel's and could not
estimate the size of the gas station lot.  (Tr. 28, 29).  Sampel's vehicle was a silver or
gray-colored Nissan Pathfinder SUV; a female was sitting in the passenger seat of the vehicle.
(Tr. 18, 19, 27-28).  Carbonel testified that Sampel was outside his car at the gas pumps,

although he could not recall whether Sampel was pumping gas or whether he went inside the store.  (Tr. 20, 27, 34).  Carbonel testified that he saw Sampel's face "for as long as he was outside of his car."  (Tr. 34).  Carbonel could not recall what Sampel was wearing or whether he had any facial hair.  (Tr. 36).  Carbonel testified that the lighting was adequate and that he could see Sampel clearly.  (*Id.*).

From the Valero gas station, Carbonel followed Sampel to the vicinity of 1045 South Clinton Avenue.  (Tr. 20).  According to Carbonel, Sampel's vehicle pulled into the parking lot at 1045 South Clinton Avenue, and Carbonel parked "down the street a little bit." (Tr. 30-31).  Carbonel asserted that he was "more than one house" away, but could not remember if he was further than five houses from 1045 South Clinton.  (Tr. 31).  Carbonel could not see Sampel from where he was parked and did not observe Sampel exit his vehicle.  (Tr. 31-32). When Sampel drove away from the area, Carbonel followed Sampel's vehicle and terminated surveillance in the area of Norton and Teralta Streets.  (Tr. 20).  Carbonel estimated that he conducted surveillance for a total of approximately twenty-five minutes.  (*Id.*).

When surveillance was completed, Carbonel testified that he returned to his office, looked at Sampel's photograph, and confirmed that the individual he saw operating the Nissan Pathfinder was the same person in the photograph.  (Tr. 21).  Carbonel estimated that no more than one hour elapsed from the time he saw Sampel at the gas station to the time he returned to the office and reviewed the photograph.  (*Id.*).

## REPORT & RECOMMENDATION

### I.    Motion for a *Franks* Hearing

Sampel contends that he is entitled to a *Franks* hearing because of the inclusion of an allegedly false and misleading statement in each of Smith's and Mahaffy's affidavits submitted in support of the applications for wiretap authorization, GPS monitoring of Sampel's vehicle, and the warrant to search 4 Bru Mar Drive.  (Docket ## 152 at 6; 158 at 2-4).  Sampel further maintains that the challenged statement was material to each probable cause determination and, when excised from the affidavit, renders the warrants invalid, thus requiring suppression of all communications and evidence seized pursuant to them.  (*Id.*).

Ordinarily, a reviewing court's obligation is merely to determine that the issuing judge had a "substantial basis for ... conclud[ing] that probable cause existed."  *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate").  "Nevertheless, little or no deference is due where the government's affidavit misstated or omitted material information about probable cause."  *United States v. Rajaratnam*, 2010 WL 4867402, *7 (S.D.N.Y. 2010) (citing *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000)), *aff'd*, 719 F.3d 139 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2820 (2014).

Under *Franks v. Delaware*, 438 U.S. 154 (1978), "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information."  *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. at 154).  To justify a *Franks* hearing, a defendant challenging an affidavit must make "a substantial preliminary showing that (1) the affidavit contained false

statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the

challenged statements or omissions were necessary to the [judge's] probable cause finding." *Id.*

(citing *Franks*, 438 U.S. at 171-72) (internal quotation omitted).  As the Supreme Court has

explained:

> To mandate an evidentiary hearing, the challenger's attack must be
> more than conclusory and must be supported by more than a mere
> desire to cross-examine.  There must be allegations of deliberate
> falsehood or of reckless disregard for the truth, and those
> allegations must be accompanied by an offer of proof.  They
> should point out specifically the portion of the warrant affidavit
> that is claimed to be false; and they should be accompanied by a
> statement of supporting reasons.  Affidavits or sworn or otherwise
> reliable statements of witnesses should be furnished, or their
> absence satisfactorily explained.

*Franks*, 438 U.S. at 171.

With respect to the first prong, "[a]llegations of negligence or innocent mistake

are insufficient." *Id.*  Instead, "[t]he focus is not on whether a mistake was made, but rather on

the intention behind the mistake." *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn.

2001) (citing *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)), *aff'd*, 69 F. App'x

492 (2d Cir. 2003).  Thus, *Franks* teaches that not all statements in an affidavit have to be true;

instead, "the statements [must] be 'believed or appropriately accepted by the affiant as true.'"

*See United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989) (quoting *Franks*, 438 U.S. at

165), *cert. denied*, 498 U.S. 866 (1990).

To determine whether a misstatement in an affidavit is material, the court must

"set[ ] aside the falsehoods in the application, . . . and determine [w]hether the untainted portions

[of the application] suffice to support a probable cause . . . finding." *United States v.*

*Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (internal quotations and citations omitted), *cert.*

*denied*, 134 S. Ct. 2820 (2014).  According to the Second Circuit, "[t]he ultimate inquiry is

whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause."  *Id.* at 146 (quoting *United States v. Canfield*, 212 F.3d at 718).

In this case, the challenged statement pertains to the ownership of Farmers Insurance at 1038 Lyell Avenue, Rochester, New York.  (Docket ## 152 at 9; 158 at 3).  According to Sampel, the agents affirmed that CS1 stated "that Dennis Smith told CS1 that Smith has a cocaine source [who] is a Spanish male [who] owns a Farmers Insurance Company on Lyell Avenue and that this Spanish male utilizes the business to conceal cocaine shipments in automobile batteries to facilitate his cocaine operation," and additional investigation revealed that Juan Sampel and his wife "Miriam Sampel" were listed owners of the Farmers Insurance.  (*Id.*).  Defendant counters, "[u]pon information and belief, Juan Sampel is not listed as an owner of the Farmers Insurance Company and such information was false."  (Docket # 152 at 9).

Defendant has submitted a copy of a Monroe County Clerk's Office document supplied by the government in discovery entitled, "Certificate of Partners Doing Business Under Assumed Name" ("DBA").  (Docket # 158 at 8-9).  The certificate lists Miriam Rivera and Juan Sampel, both of 20 Merkle Dr. W. Rochester NY 14606, as "conducting business partners at MJS Insurance Agency" located at "1038 Lyell Ave, Rochester NY 14606."  (*Id.*).  The form was signed by Juan Sampel and Miriam Rivera before a notary public on July 6, 2010, and was filed with the Clerk's Office on July 7, 2010.  (*Id.*).  Defendant has also supplied an Agent Appointment Agreement between Miriam Rivera and Farmers Insurance dated February 1, 2014.  (*Id.* at 10-17).  The form does not mention Juan Sampel.

The government maintains that none of these documents in fact contradict Smith's and Mahaffy's sworn statements.  (Docket # 160 at 3).  According to the government,

the Agency Agreement merely confirms the connection between the business at 1038 Lyell Avenue and Farmers Insurance Company. (*Id.* at 4). The government reasons that the issue whether the insurance business was a "Farmers Insurance Company" was not material to the probable cause determinations. (*Id.*). According to the government, the business at 1038 Lyell Avenue was the only business that matched the description given by CS1, and that information, considered with the other evidence contained in the affidavits, easily established probable cause to support the warrants. (*Id.*).

It is well-settled that "[a] *Franks* hearing is not required where it is sought merely on the basis of an allegation that the information in the . . . warrant affidavit subsequently proved to be inaccurate." *United States v. Harper*, 2006 WL 2873662, *8 (W.D.N.Y. 2006). Rather, a defendant must demonstrate that the affiant knew that the statement was false and nonetheless intentionally or recklessly included it. *See id.* With respect to the standard for proving reckless disregard for the truth, "the defendants [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations. Because states of mind must be proved circumstantially, a factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (quoting *United States v. Whitely*, 249 F.3d 614, 621 (7th Cir. 2001)), *cert. denied* 134 S. Ct. 2820 (2014).

Smith's and Mahaffy's affidavits include various allegations relating to the insurance company located at 1038 Lyell Avenue. Mahaffy's affidavits supporting the warrant applications for Target Telephones One and Two state that "Juan Sampel and his wife Miriam Sampel are the listed owners of that Farmers Insurance Company." (Mahaffy Aff. 1 at ¶¶ 27, 54; Mahaffy Aff. 2 at ¶ 20). They also state that "according to records from the Monroe County

Clerk's Office, Juan Sampel and Miriam Sampel filed a DBA for MJS Insurance Agency, operating out of 1038 Lyell Avenue, Rochester, New York, on July 7, 2010." (Mahaffy Aff. 1 at ¶ 54; Mahaffy Aff. 2 at ¶ 20). Those affidavits note that Sampel's phone number 585-857-1888 "is listed to MJS Insurance, 1038 Lyell Avenue, Rochester, New York." (*Id.*). Smith's affidavit supporting the GPS warrant states only that "Juan Sampel and his wife Miriam Sampel are the listed owners of that Farmers Insurance Company," but makes no reference to the DBA or to MJS Insurance. (Smith Aff. at ¶ 8). Mahaffy's affidavit supporting the warrant application for 4 Bru Mar Drive recites that Target Telephone Two, used by Sampel, is subscribed to MJS Insurance at 1038 Lyell Avenue with Juan Sampel listed as a contact. (Mahaffy Search Warrant Aff. at ¶ 9). It also states that "Juan Sampel and his wife Miriam Sampel are the listed owners of th[e] Farmers Insurance Company," but makes no reference to the DBA. (*Id.* at ¶ 21).

The identification of Miriam Rivera as Miriam Sampel was not inaccurate because the investigation had revealed that the defendant and Miriam Rivera were married and that Rivera was sometimes known as Miriam Sampel. Nor was the challenged statement – that Sampel owned the Farmers Insurance Company – obviously false. Although the Agent Appointment Agreement with Farmers Insurance identified only Miriam Rivera and not Juan Sampel, defendant has offered no evidence suggesting that Juan Sampel was no longer involved in the business. *Franks*, 438 U.S. at 171; *see United States v. Harper*, 2006 WL 2873662 at *9 (denying *Franks* hearing where defendant failed to submit "any evidence to suggest that [the officer] was aware of any alleged falsity at the time she drafted the affidavit or that she disregarded obvious reasons to doubt the accuracy of the information provided by the informant").

In any event, I find that the challenged statement was not material to the probable cause determinations for each warrant.  The evidence in the affidavits showed that Sampel was involved in the operation of the business at 1038 Lyell Avenue.  For example, in the supporting affidavits for Target Telephones One and Two, and 4 Bru Mar Drive, Mahaffy affirmed that 585-857-1888, Target Telephone Two, was registered to "MJS Insurance, 1038 Lyell Avenue, Rochester, New York, with Juan Sampel listed as a contact name."  (Mahaffy Aff. 1 at ¶ 54; Mahaffy Aff. 2 at ¶ 7; Mahaffy Search Warrant Aff. at ¶ 9).  In addition, the affidavits recounted information from CS1 that Dennis Smith reported that Sampel used an insurance company called Farmers Insurance on Lyell Avenue to conceal cocaine; a DBA for MJS Insurance on Lyell Avenue, the insurance storefront matching the location identified by Dennis Smith to CS1, listed Sampel and his wife as "conducting business partners."  This information, coupled with the intercepted communications and surveillance evidence summarized in the affidavits, was sufficient to establish probable cause to believe that Sampel was involved in drug trafficking activities and that relevant evidence would be located at his home, through the tracking of his car, and over the target telephones – even if the assertion that he was an owner of the business were excised from consideration.  *See United States v. Rajaratnam*, 2010 WL 4867402 at *11 ("a *Franks* hearing is required only if the government's misstatements were necessary to [the issuing judge's] decision to authorize the [warrant] [;] . . . [the inquiry] is, after setting aside the government's misstatements and adding what it omitted from the affidavit, does the [c]ourt find that the affidavit set forth minimally adequate facts to establish probable cause").  *See also United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir. 1995) (*Franks* hearing not required where "alleged false statement constituted only one paragraph of an eleven-page affidavit; even if that paragraph were redacted, the remainder of the affidavit provided ample probable cause for the

search warrant"), *cert. denied*, 517 U.S. 1187 (1996); *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir.) ("[t]he ultimate inquiry on a motion to suppress is not – as defendants contend – whether the affidavit contains false allegations or material omissions, but whether after putting [the challenged statements] aside, there remains a residue of independent and lawful information sufficient to support probable cause"), *cert. denied*, 474 U.S. 1032 (1985); *United States v. Battle*, 2013 WL 5769982, *11 (D. Vt. 2013) ("even without the material misstatements of fact, the search warrant was supported by probable cause").  For these reasons, I recommend denial of Sampel's motion for a *Franks* hearing and for suppression of evidence and intercepted communications seized pursuant to the challenged warrants.

## II.    Motion to Suppress Wiretap Evidence

Sampel seeks suppression of the communications intercepted over warrants for Target Telephones One through Five on the grounds that the supporting affidavits failed to demonstrate that, before resorting to the use of wiretaps, traditional investigative procedures had been attempted and had proved unsuccessful.[11]  (Docket # 152 at 11-18).  According to Sampel, because the applications failed to show that traditional investigative means had been exhausted, the "warrants were not necessary and the fruits of those interceptions should be suppressed as unlawfully intercepted."  (*Id.* at 18).[12]

An application for a wiretap authorization must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why

---

[11]  Sampel also challenges the finding of probable cause authorizing interception of Target Telephone Two, Sampel's telephone number.  This argument is addressed *infra*.

[12]  The record plainly demonstrates, and the government has properly conceded, that Sampel has standing to move to suppress communications intercepted pursuant to the warrants.  (Docket # 155 at 11); *see United States v. Rodriguez*, 2009 WL 2569116, *4 (S.D.N.Y. 2009) ("defendants who are named targets or interceptees of a wiretap automatically have standing under Title III") (citations omitted).

they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.

§ 2518(1)(c). A judge may approve a wiretap application only after determining that such a

showing has been made. 18 U.S.C. § 2518(3)(c). This requirement "is simply designed to

assure that wiretapping is not resorted to in situations where traditional investigative techniques

would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). In

other words, the government need not "exhaust all conceivable investigative techniques before

resorting to electronic surveillance," but must resort to telephonic surveillance only "when it is

necessary to assist in law enforcement." *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir.

2009); *United States v. Funderburk*, 492 F. Supp. 2d 223, 242 (W.D.N.Y. 2007) (the "other

investigative procedures" requirement is not intended to turn electronic surveillance into a "tool

of last resort"). "'Merely because a normal investigative technique is theoretically possible, it

does not follow that it is likely' to succeed." *United States v. Crosby*, 2010 WL 4703615, *3

(W.D.N.Y.) (quoting *United States v. Torres*, 901 F.2d 205, 231-32 (2d Cir. 1990), *abrogated on

other grounds as recognized by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010)), *report

and recommendation adopted*, 2010 WL 4703596 (W.D.N.Y. 2010). The wiretap application

needs only to inform the issuing court "of the nature and progress of the investigation and of the

difficulties inherent in the use of normal law enforcement methods." *United States v.

Concepcion*, 579 F.3d at 218 (quoting *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir.), *cert.

denied*, 528 U.S. 875 (1999)).

In narcotics conspiracy investigations, this requirement may be satisfied by

"describing how traditional investigative techniques had failed to provide more than 'a limited

picture' of [the] narcotics organization." *United States v. Valdez*, 1991 WL 41590, *2

(S.D.N.Y.) (quoting *United States v. Torres*, 901 F.2d at 232), *aff'd*, 952 F.2d 394 (2d Cir. 1991).

Moreover, wiretaps are particularly appropriate when "the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (internal quotation omitted).

This Court's review of the issuing court's determination is not *de novo*; rather, the reviewing court must determine only whether "the facts set forth in the application were minimally adequate to support the determination that was made." *Concepcion*, 579 F.3d at 217 (quoting *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997) (agent's assertion that surveillance had been conducted unsuccessfully on numerous occasions was "minimally adequate"), *cert. denied*, 524 U.S. 905 (1998)); *see also United States v. Miranda*, 1993 WL 410507, *2 (S.D.N.Y. 1993) (issuing court's determination concerning sufficiency of normal investigative techniques is entitled to "substantial deference"). The reviewing court must test the application in a "practical and commonsense fashion." *Concepcion*, 579 F.3d at 218.

Applying a practical, commonsense and deferential review to the instant case, I find that Mahaffy's supporting affidavits were adequate to support a finding for each wiretap that further use of traditional investigative techniques appeared unlikely to succeed or were too dangerous to employ. Mahaffy identified twelve goals and objectives of the investigation in each affidavit. (Mahaffy Aff. 1 at ¶ 65; Mahaffy Aff. 2 at ¶ 46; Mahaffy Aff. 3 at ¶ 68; Mahaffy Aff. 4 at ¶ 75). The goals included, *inter alia*, prosecuting the co-conspirators and dismantling the network; seizing the greatest possible quantities of controlled substances and/or proceeds; ascertaining the sources of the controlled substances; identifying books and records documenting the operations, instrumentalities, and proceeds of the drug trafficking network; and identifying and dismantling additional drug trafficking organizations in the greater Rochester area. (*Id.*). Mahaffy affirmed that "[a]ll traditional avenues of investigation have been carefully evaluated

for use or have been attempted with limited results." (Mahaffy Aff. 1 at ¶ 70; Mahaffy Aff. 2 at ¶ 53; Mahaffy Aff. 3 at ¶ 75; Mahaffy Aff. 4 at ¶ 82).

Sampel maintains that the use of traditional investigative techniques in this investigation, such as use of confidential informants, surveillance, undercover officers, and GPS tracking, "resulted in success, not failure." (Docket # 152 at 16). He argues that "there is no factual basis alleged to show that a continuation of these successful means would not meet the goals of the investigation." (*Id.*). In addition, he posits that additional physical surveillance, use of pole cameras, toll records, interviews and grand jury investigations could have aided the investigation in a less intrusive manner than the use of the wiretaps, and that Mahaffy's "[g]eneralized and conclusory statements to the contrary [were] mere speculation unsupported by the facts and insufficient to meet the statutory requirements." (*Id.*).

Mahaffy's affidavits, however, are not generalized or conclusory; rather, they contain detailed assessments of the progress of the investigation and the limitations of various traditional investigative methods. For instance, Mahaffy acknowledged in each affidavit that much of the information "was obtained from historical investigation and controlled purchases of narcotics by the confidential sources." (Mahaffy Aff. 1 at ¶ 71; Mahaffy Aff. 2 at ¶ 54; Mahaffy Aff. 3 at ¶ 76; Mahaffy Aff. 4 at ¶ 83). Indeed, Mahaffy noted that between May 2015 and January 2016, prior to the authorization of any wiretaps, agents had conducted six separate controlled purchases of cocaine from Smith using CS1, totaling in excess of 200 grams of cocaine. (Mahaffy Aff. 1 at ¶ 32). Mahaffy explained that although CS1 could continue to perform additional controlled purchases of cocaine from Smith, the purchases and any consensual recordings made in conjunction with those purchases would be "of limited value because Smith and his associates do not openly discuss the full scope of their criminal

enterprise." (*Id.* at ¶ 73). CS1 was unable to provide "information concerning dates, times or locations that Smith may meet with any suppliers or details concerning the exact arrangements Smith has with any of his suppliers." (*Id.*). In addition, Mahaffy stated that it was unlikely that "CS1 will be able to learn this information because in addition to Smith not talking openly about the full scope of this narcotics trafficking organization, Smith usually is already in possession of the cocaine CS-1 purchases when CS-1 engages in controlled purchases from Smith." (*Id.*). Mahaffy further elaborated on the ways in which the use of other confidential sources were limited or were reaching the end of their productive capacities. (*Id.* at ¶¶ 74-76). Targets were wary that CS2 and CS5 might be cooperating with law enforcement, Mahaffy asserted. (*Id.* at ¶ 74). CS3 and CS4 were no longer "available" to law enforcement. (*Id.*). CS6 was unable to purchase cocaine directly from Ocasio or Quintana. (Mahaffy Aff. 4 at ¶ 85). Thus, despite Sampel's assertion that use of the confidential sources was "successful," Mahaffy's affidavits showed that such use would be unable to reveal "the full scope of this organization and to supply sufficient evidence to convict all of the co-conspirators, especially the leaders of this criminal organization." (*Id.* at ¶ 86). As Mahaffy's affidavits illuminated, confidential sources are often "street dealers or individuals not operating at the core of the racketeering and drug conspiracies." *United States v. Diaz*, 176 F.3d at 111 (finding that the government properly explained how sources of drug supplies and location of drug proceeds could not be fully ascertained through informants). In sum, Mahaffy's affidavits demonstrated the limitations of the use of informants in this case and properly justified the need for additional investigative avenues.

Physical and remote surveillance techniques, including pen registers and trap and trace devices, were used throughout the investigation to identify the members of the organization and confirm their movements. As the investigation continued and wiretaps were authorized,

physical and remote surveillance supplemented the intercepted conversations to substantiate the

targets' movements.  For example, in his affidavit for Target Telephone Three, Mahaffy

described visual surveillance near the "clubhouse," which was undertaken in response to a series

of text messages and telephone calls intercepted between Smith, Sampel, and Ball on February 8,

2016.  (Mahaffy Aff. 3 at ¶¶ 59-62).  Mahaffy's explanation of the surveillance also illustrated

the limitations encountered by the investigative team in performing physical surveillance.  On

this date, agents believed that Sampel traveled to the clubhouse and sold cocaine to Smith, who

then sold a quantity of cocaine to Ball inside the apartment.  (*Id.* at ¶ 62).  Mahaffy affirmed that

an agent observed a male, believed to be Ball, exit the South Clinton apartment and open the rear

driver's side door of a black Mercedes and lean "toward the floor of the vehicle in a manner

consistent with placing something on the ground."  (*Id.* at ¶ 60).  The individual then got into the

driver's seat of the Mercedes and drove away.  (*Id.*).  As Mahaffy explained, another agent

confirmed the Mercedes' arrival at the 400 block of Central Avenue, but then lost visual contact

"as it was believed that the black Mercedes" turned onto "a secluded street," and continued

surveillance would have "increase[d] the risk of detection by surveillance units."  (*Id.* at ¶ 61).

In other words, surveillance was unable to confirm Ball's final destination or the presence and

quantity of cocaine in his vehicle.

        Mahaffy also explained that surveillance proved difficult because drug traffickers

employ lookouts on the streets, in vehicles, and in buildings.  (*Id.* at ¶ 83).  Mahaffy described an

incident on September 1, 2015, in which Smith exited a residence on 24 St. Clair Street,

Rochester, New York, and continuously watched surveillance vehicles drive by his residence,

leading the agents to terminate surveillance to avoid detection.  (*Id.*).  Mahaffy also noted that

tracking devices and surveillance would not reveal "the nature and purpose of [the targets'] visits

to locations." (*Id.* at ¶ 85). Further, pen registers and toll records could not "identify the participants of the conversations or the content of the conversations." (*Id.* at ¶ 93). Mahaffy also described the limitations of interviews and grand jury investigations, search warrants, subpoenas to service providers, undercover officers, financial investigations, and mail covers, to reveal the full scope of the organization and the identification of other conspirators. (Mahaffy Aff. 1 at ¶¶ 89-99; Mahaffy Aff. 2 at ¶¶ 71-84; Mahaffy Aff. 3 at ¶¶ 95-108; Mahaffy Aff. 4 at ¶¶ 103-16).

The subsequent applications seeking extensions of the initial applications provide further reasons why traditional investigative means were not sufficient to accomplish the investigative goals in this case. (Mahaffy Aff. 1a; Mahaffy Aff. 2a; Mahaffy Aff. 1c). For example, in his affidavit dated February 18 seeking the first extension for the wiretap authorization on Target Telephone One, Smith's telephone, Mahaffy explained that although agents had learned of another location owned by Smith that was potentially being used to store and process cocaine, they had yet to confirm that information and had also discovered an "unknown drug associate" of Smith's. (Mahaffy Aff. 1a at ¶ 106). Mahaffy's final affidavit in support of the warrant authorizing continued surveillance on Target Telephones One, Two, Four, and Five, dated April 6, 2016 ("Mahaffy Aff. 1c") summarized how the investigation to date had led to the identification of those who occupied principal positions in the conspiracy. (Mahaffy Aff. 1c at ¶ 153). Mahaffy explained that based on recently intercepted communication, "agents believe[d] that Ocasio and other co-conspirators [might] be receiving some cocaine through the mail from Puerto Rico, utilizing the U.S. Postal Service ["USPS"] to engage in bulk cash smuggling of cocaine proceeds to Puerto Rico, and [might] also be laundering cocaine proceeds by purchasing vehicles for cash." (*Id.* at ¶ 149). The investigating agents had obtained records

from the USPS and were "working with a member of the U.S. Postal Inspection Service to conduct further investigation into parcels being mailed and received by" the organization. (*Id* at ¶¶ 86, 147). Mahaffy explained, however, that "none of the law enforcement officers [he was] working with kn[e]w of any other individuals who [were] intimately involved with Smith, Ocasio, Sampel, or the other Target Subjects, much less any who [were] actually willing to cooperate with law enforcement." (*Id.* at ¶ 137). The investigation had still not "yielded conclusive information concerning the locations where the Target Subjects . . . receive[d], store[d], manufacture[d], or package[d] their drug supply." (*Id.* at ¶ 140). Mahaffy's affidavit stated that continued interception would help to uncover "the full scope of this conspiracy . . . [,] including sources of supply of cocaine, and evidence for the successful prosecution of the subjects involved." (*Id.* at ¶ 152).

Judging the affidavits under the legal standards described above, I reject Sampel's argument that the wiretap orders are invalid because law enforcement did not exhaust other traditional investigative techniques. *See Concepcion*, 579 F.3d at 218, 219 (law enforcement need not exhaust "all conceivable investigative techniques"; fact that "leads could have been better leveraged before resorting to a wiretap" does not mandate suppression where affidavit was otherwise "minimally adequate"); *United States v. Mitchell*, 2010 WL 55927, *5 (W.D.N.Y. 2010) (affidavits were sufficient where they asserted that "normal investigative techniques" provided only "a limited picture of the drug distribution network").

In sum, this Court finds that the supporting affidavits for warrants on Target Telephones One through Five sufficiently identified the traditional investigative techniques that had been utilized and adequately informed the issuing court why other techniques were unlikely to achieve the aims of the investigation. Accordingly, I find that the factual recitations set forth

in those affidavits were adequate to support the wiretap orders.  *See Concepcion*, 579 F.3d at

219.  Sampel's motion to suppress the wiretap communications based upon the alleged failure to

demonstrate the futility of other investigative techniques should therefore be denied.


**III.**    **Motion to Suppress Identification**

The government has provided notice of its intent to offer evidence of a

photographic identification of the defendant made by Carbonel on January 22, 2016.  (Docket

# 149).  Presumably, the government is referring to Carbonel's identification of the photograph

of Juan Sampel as the individual whom he had seen approximately an hour earlier at the Valero

gas station.  Defendant moves to suppress that evidence on that grounds that the procedure was

unduly suggestive and resulted in an "irreparable misidentification."  (Docket # 158 at ¶¶ 14-15).

On November 6, 2017, the Court held an evidentiary hearing, and Carbonel testified.  (Docket

## 162-63).

Evidence of eyewitness identification will be suppressed under the due process

clause if a pretrial "photographic identification procedure was so impermissibly suggestive as to

give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United*

*States*, 390 U.S. 377, 384 (1968).  In determining whether to exclude identification testimony, a

court must first consider whether the identification procedure was unduly suggestive.  *Id*.  If the

identification procedure was unduly suggestive, the court must proceed to determine whether the

identification nevertheless possesses "sufficient aspects of reliability."  *United States v. Bubar*,

567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert.*

*denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or impermissibly)

suggestive . . . [,] a district court may still admit the evidence 'if, when viewed in the totality of

the circumstances, it possesses sufficient indicia of reliability.'"  *United States v. Bautista*, 23

F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934,

950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).  To

determine reliability, the Court should consider the factors articulated in *Neil v. Biggers*, 409

U.S. 188, 199-200 (1972).  These factors include "the opportunity of the witness to view the

criminal at the time of the [contact], the witness' degree of attention, the accuracy of the witness'

prior description of the criminal, the level of certainty demonstrated by the witness [during the

identification], and the length of time between the [contact] and the [identification]."  (*Id.*).

        With respect to the photographic identification procedure challenged here, the

record establishes that Carbonel viewed a single photograph of Sampel – the same photograph he

had reviewed earlier the same day before conducting surveillance – and identified him as the

man he had seen at the gas station.  (Tr. 18, 21, 34-35).  Assuming that Carbonel's observation of

a single photograph could be said to be an unduly suggestive procedure, this Court will proceed

to assess the reliability of the identification.

        Carbonel testified that he had been employed by the RPD for the past twenty-four

years and currently worked as an investigator in the homicide unit.  (Tr. 13-14).  On January 22,

2016, he was working in the narcotics unit and was involved in an investigation of Sampel and

Dennis Smith.  (Tr. 15).  During an approximately five-hour period that day, he "looked at" a

single photograph of Sampel (whom he had not previously met) "a couple times."  (Tr. 16-17,

22-24).  Carbonel testified that when he parked in the gas station at about 7:00 p.m. that evening,

the gas station was well lit, and Carbonel was able to see Sampel clearly through his vehicle's

front windshield.  (Tr. 19-20, 35-36).  Carbonel indicated that he saw Sampel standing outside

his car and was able to see his face.  (Tr. 25, 27, 34).  Carbonel's focus was on the defendant and

his vehicle.  (Tr. 19).  Carbonel testified that no more than one hour elapsed from the time that he

terminated surveillance to the time that he viewed the photograph again at his office and

confirmed that the man he had seen at the gas station was Sampel.  (Tr. 18, 21).  Asked to

characterize his degree of confidence, Carbonel responded, "a hundred percent."  (Tr. 18-19).

On this record, I find that Carbonel's identification of Sampel is sufficiently

reliable to permit the government to offer his testimony about it.  *See United States v.*

*Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990) ("[t]he linchpin for admissibility of

identification testimony is reliability"), *cert. denied*, 501 U.S. 1233 (1991).  I thus recommend

that Sampel's motion to suppress identification testimony be denied.


## IV.    Motion to Suppress Statements

In his omnibus motions, Sampel moved to suppress all statements he made to any

"public servant."  (Docket # 152 at 19).  At a hearing before the Court on November 6, 2017,

defendant withdrew this motion, stating that the government had agreed that it would not

introduce at trial in its direct case any statements Sampel made before being advised of his

*Miranda* rights.  (Docket # 162; Tr. 10-12).  As counsel further acknowledged, the government

has reserved its right to introduce post-*Miranda* statements made by Sampel.  (*Id.*).  Based on

these representations, I recommend that Sampel's motion to suppress statements be denied as

moot.


## V.    Motion to Suppress GPS Tracking Device Evidence

Defendant challenges the warrant authorizing the installation and monitoring of a

GPS tracking device on a 2006 Nissan Pathfinder.  (Docket # 152 at 23-25).  The warrant was

signed by this Court on February 9, 2016, based on SA Smith's supporting affidavit.  (Docket # 165).

###### A.    __Standing__

The secret placement of a GPS tracking device on a vehicle is a search within the meaning of the Fourth Amendment.  *United States v. Jones*, 565 U.S. 400, 404 (2012) ("[w]e hold that the [g]overnment's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'") (footnote omitted).  "[T]o mount a successful Fourth Amendment challenge, 'a defendant must demonstrate that he personally has an expectation of privacy in the place searched.'"  *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).  Here, Sampel has submitted a sworn affidavit stating that the vehicle in question, a 2006 Gray Nissan Pathfinder, is registered to his wife, Miriam Sampel, and he is "authorized to drive the vehicle," is the "primary user of the vehicle," and uses "the vehicle as [his] main means of transportation." (Docket # 153-2 at ¶ 4).  I find that Sampel's affidavit is sufficient to establish that he had a reasonable expectation of privacy in the car, permitting him to challenge the tracking warrant. *See United States v. Ruggiero*, 824 F. Supp. 379, 391 (S.D.N.Y. 1993) ("[i]t is well established that in order to challenge a search, a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search"), *aff'd*, 44 F.3d 1102 (2d Cir. 1995); *see also United States v. Jones*, 565 U.S. at 404 n.2 (noting that government had not challenged lower court's determination that defendant had standing to challenge tracking device on car registered to his wife that he "exclusive[ly]" drove).

B.    **Probable Cause**

Sampel challenges the validity of the warrant on the grounds that SA Smith's affidavit failed to establish probable cause to support the installation of the tracking device.[13] (Docket # 152 at ¶¶ 24-25).  Sampel argues that the affidavit is based on false information supplied by a confidential informant.  Without this false information, defendant argues, the rest of the affidavit, which relies on evidence collected from intercepted telephone calls and text messages on one date, does not establish probable cause.  (*Id.*).

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement.  According to the Court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the court] . . . [,] there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238.  A reviewing court's obligation is merely to determine that the issuing judge "'had a substantial basis for . . . conclud[ing]' that probable cause existed."  *United States v. Smith*, 9 F.3d at 1012 (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d at 157 ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate").  Moreover, "resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  *Smith*, 9 F.3d at 1012 (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

---

[13]  One of defendant's principal challenges relates to the truth of the assertion that the defendant owns the Farmers Insurance Company at 1038 Lyell Avenue – a contention that is addressed more fully *supra*.

This Court finds that the allegations in SA Smith's affidavit amply establish probable cause for the warrant.  Smith's affidavit summarized three main pieces of evidence: first, the information provided by CS1 that Smith's cocaine source was a "Spanish male" who owned Farmers Insurance on Lyell Avenue (Smith Aff. at ¶ 8); second, the confirmation that the Farmers Insurance Company located at 1038 Lyell Avenue was "the only business matching the description provided by" CS1 and that Juan and Miriam Sampel are the listed owners of that business (a statement that was neither false nor misleading, as discussed *supra*) (*id.*); and, third, a detailed description, including a summary of visual and video surveillance and intercepted communications, of a drug transaction involving Dennis Smith and Sampel on January 22, 2016 (*id.* at ¶¶ 9-17).

Although the intercepted communications between Sampel and Smith did not explicitly reference narcotics, "drug dealers rarely speak openly about their trade; instead, they often engage in a so-called 'narcotics code.'"  *United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995) (quoting *United States v. Sisca*, 503 F.2d 1337, 1343 (2d Cir.), *cert. denied*, 419 U.S. 1008 (1974)).  "Use of such a narcotic code is certainly 'supportive of a probable cause finding.'"  *Id.* (quoting *United States v. Feola*, 651 F. Supp. 1068, 1096 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989), *cert. denied*, 493 U.S. 834 (1989)) (additional citations omitted).  I find that, based upon his training and experience, SA Smith's interpretation of the communications as drug-related was reasonable.  For example, the intercepted communications included Sampel's text to Smith, "Cool I should have that for u I'll put it together now," and his agreement to meet Smith at "the clubhouse."  (*Id.* at ¶¶ 9-10).  Sampel then said he would take longer than expected because he "had to go see the man."  (*Id.* at ¶ 11).  SA Smith's interpretation was further corroborated by surveillance of Sampel's arrival at the "clubhouse"

(the South Clinton Apartments), entry into the apartments, and subsequent entry into Smith's car before departing the area. (*Id.* at ¶¶ 16-17).

Taken together, the evidence summarized by SA Smith in his affidavit provided sufficient probable cause to believe that Sampel used his 2006 Nissan Pathfinder to further drug trafficking activities and that evidence of such crimes would be obtained by tracking the vehicle's movements. *See*, *e.g.*, *United States v. Bailey*, 2016 WL 6995067, *32 (W.D.N.Y. 2016) (finding sufficient probable cause to support issuance of warrant for GPS tracking device), *report and recommendation adopted*, 2017 WL 663578 (W.D.N.Y. 2017); *United States v. Carmichael*, 2016 WL 9273619, *2-3 (W.D.N.Y. 2016) (finding probable cause to authorize GPS tracker based on intercepted telephone calls), *report and recommendation adopted*, 2017 WL 2880116 (W.D.N.Y. 2017). For these reasons, I recommend denial of Sampel's motion to suppress evidence obtained from the GPS tracking device.

## VI.  Motion to Suppress Evidence Obtained from 4 Bru Mar Drive

Sampel also contends that the April 26, 2016 search warrant for his residence at 4 Bru Mar Drive[14] was unsupported by probable cause.[15]  (Docket # 152 at 20-23).  He argues that the supporting affidavit was insufficient to demonstrate probable cause to believe that drugs or drug-related evidence would be located inside the residence. (*Id.* at 22). At best, Sampel argues, the affidavit depicted Sampel as "the go between between Angel Ocasio and Dennis Smith," but

---

[14]  On the record before the Court, I find that Sampel has standing to challenge the search of 4 Bru Mar Drive.  (*See* Docket # 153-1).

[15]  One sentence of Sampel's motion suggests that he may also be challenging the warrant on the grounds that it is an unconstitutional "general" warrant.  (*See* Docket # 152 at ¶ 28).  This conclusory argument is baseless. The warrant sufficiently particularizes the place to be searched and the evidence to be searched for and seized. *See United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013).

lacked allegations that Sampel was observed possessing or handling cocaine or that he "store[d], possesse[d], or use[d] drugs at the residence of 4 Bru Mar Drive."  (*Id.*).

Contrary to Sampel's assertion, the affidavit does include factual allegations suggesting that Sampel stored and possessed drugs at 4 Bru Mar Drive.  For instance, based on intercepted telephone calls and text messages between Sampel, Smith, and Ocasio on February 12, 2016, Mahaffy opined that, on that date, Sampel obtained two kilograms of cocaine from Ocasio and took the cocaine to his residence at 4 Bru Mar Drive for a time.  (Mahaffy Search Warrant Aff. at ¶ 57).  Likewise, based on interceptions between February 22 and 24, 2016, Mahaffy opined that on February 23 Sampel took three kilograms of cocaine from Ocasio's home to 4 Bru Mar Drive before transporting the cocaine to Smith at the South Clinton Apartments.  (*Id.* at ¶ 154).  That same night, Sampel returned to 4 Bru Mar Drive with the money from the sale, which he kept at home overnight before taking it the next day to 1038 Lyell Avenue for Ocasio to pick up.  (*Id.* at ¶¶ 153-54).  Defendant's anodyne characterization of his alleged activities as those of a "go between" is belied by the evidence contained in Mahaffy's affidavit of his role in substantial drug trafficking.  *See United States v. Neils*, 156 F.3d 382, 383-84 (2d Cir. 1998) (a "steerer," who acts as a go-between for customers and suppliers, "cannot be considered a 'minimal participant' in the rather typical street-level distribution scheme") (quoting *United States v. Colon*, 884 F.2d 1550, 1552 (2d Cir. 1989), *cert. denied*, 493 U.S. 998 (1989), *abrogation recognized on other grounds by United States v. Kane*, 452 F.3d 140 (2d Cir. 2006)).

In addition to the allegations that Sampel used 4 Bru Mar Drive to store cocaine and proceeds from cocaine sales, Mahaffy opined in his affidavit, based upon his training and experience, that drug traffickers frequently keep drugs, paraphernalia, proceeds, firearms, and

books and records relating to drug trafficking at their residences. (Mahaffy Search Warrant Aff. at ¶ 13). Mahaffy included numerous excerpts of phone conversations and text messages in which Sampel, using coded language, coordinate[d] the distribution of multiple kilograms of cocaine. An agent's experience that "major drug traffickers frequently maintain at their homes large amounts of cash, drugs, books, ledgers, and other documents evidencing their criminal activities . . . is an important factor to be considered by the judge reviewing a warrant application." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985); *see also United States v. Montgomery*, 2017 WL 3821262, *9 (W.D.N.Y. 2017) ("[t]he logistical proximity of . . . drug deals to [the residence], considered with [the investigator's] 25 years of experience, provided a substantial basis for [the issuing judge] to conclude that there was a fair probability that investigators would find evidence of drug dealing in [the defendant's residence]"). In sum, I find sufficient probable cause to support the warrant authorizing the search of 4 Bru Mar Drive and recommend that the district judge deny Sampel's motion to suppress physical evidence.

## VII.    Probable Cause Challenge to Target Telephone Two

Sampel also seeks to suppress communications intercepted over Target Telephone Two on the grounds that Mahaffy's affidavit in support of the wiretap warrant contained "insufficient information."[16] (Docket # 152 at 18-19). According to Sampel, Mahaffy's affidavit did not allege that Sampel was identified "by photograph or any other means" or include information concerning "undercover buys or . . . allegations of possession of narcotics with respect to Mr. Sampel, . . . [or] any other information alleging that Juan Sampel [was] a drug supplier for Dennis Smith." (*Id.* at 18).

---

[16] The Court's discussion of the allegedly false information contained in the warrant is discussed at length *supra*, and will not be repeated here.

Pursuant to 18 U.S.C. § 2518(3), before issuing a wiretap order, a judge must determine:

> [1] that there is probable cause to believe that a crime has been, is being, or is about to be committed; [2] probable cause to believe that communications about the crime will be obtained through the wiretap; [3] that alternative means have been tried and failed or appear too dangerous or unlikely to succeed; and [4] probable cause that the premises to be wiretapped are being used for criminal purposes or are used or owned by the target of the wiretap.

*United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993).  The probable cause standard applicable to wiretaps is the same as that required for a traditional search warrant.  *Id.* (citing *United States v. Rowell*, 903 F.2d 899, 901-02 (2d Cir. 1990); *United States v. Fury*, 554 F.2d 522, 530 (2d. Cir. 1977), *cert. denied* 433 U.S. 910 (1977)).  In other words, probable cause must be determined by evaluating the "totality of the circumstances."  *Gates*, 462 U.S. at 238.  As a reviewing court, this Court must accord "substantial deference" to the issuing court's finding of probable cause.  *United States v. Wagner*, 989 F.2d at 72.

Mahaffy's affidavits in support of the original warrant and the extension warrants for Target Telephone Two (Mahaffy Aff. 2; Mahaffy Aff. 2a; Mahaffy Aff. 1c) establish ample probable cause to believe that narcotics trafficking crimes were being committed and that communications over Target Telephone Two would reveal evidence about those crimes.  Mahaffy described in detail:  the information obtained from CS1 that led the investigating agents to identify Sampel as a possible source of cocaine for Smith (Mahaffy Aff. 2 at ¶¶ 7, 20); the information obtained from toll analysis and subscriber information that linked Sampel to other suspects in the organization with known narcotics-related criminal histories (*id.* at ¶¶ 14-16, 31-45); excerpts of intercepted communications between Smith and Sampel discussing and coordinating drug deals (*id.* at ¶¶ 21-45); and, visual and video surveillance confirming Sampel

and Smith's locations during these exchanges (*id.* at ¶ 29).  Mahaffy's subsequent affidavits for the warrant extensions included many intercepted communications between Sampel and Smith, and Sampel and Ocasio, further revealing the organization of the drug conspiracy and the activities and roles of the conspirators.  (Mahaffy Aff. 2a; Mahaffy Aff. 1c).  In short, I easily conclude that Mahaffy's affidavits established adequate probable cause to believe that Sampel was involved in trafficking large quantities of cocaine and that the use of electronic surveillance on Target Telephone Two would aid in the investigation.  For these reasons, I recommend that Sampel's probable cause challenge to Target Telephone Two be denied.

## VIII.    *Leon*'s Good Faith Exception

In *Leon*, the Supreme Court held that the Fourth Amendment exclusionary rule should not be applied to evidence obtained by a police officer whose reliance on a search warrant issued by a neutral magistrate was based on "objective good faith," even though the warrant itself might ultimately be found to be defective.  *United States v. Leon*, 468 U.S. 897, 918-23 (1984); *United States v. Salameh*, 152 F.3d 88, 114 (2d Cir. 1998), *cert. denied*, 525 U.S. 1112 (1999); *United States v. Benedict*, 104 F. Supp. 2d 175, 182-83 (W.D.N.Y. 2000).  The rationale underlying this good faith exception is that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity."  *United States v. Leon*, 468 U.S. at 919.

The Court in *Leon* identified four situations in which the good faith exception is inapplicable.  Specifically, an executing officer's reliance on a search warrant will not be deemed to have been in good faith:

(1)   where the issuing magistrate has been knowingly misled;

> (2) where the issuing magistrate wholly abandoned his or her judicial role;
>
> (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and
>
> (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Cancelmo*, 64 F.3d at 807 (citations omitted); *see Leon*, 468 U.S. at 923.

Although I find sufficient probable cause existed for each warrant at issue in this case, nothing in the record supports a suggestion that the issuing judges were knowingly misled or abandoned their judicial roles in authorizing the challenged warrants. Further, for the reasons explained *supra*, the applications cannot be said to be so lacking in indicia of probable cause that the agents' reliance upon them was unreasonable. Accordingly, the challenged warrants should also be upheld under *United States v. Leon*, 468 U.S. 897 (1987).

## CONCLUSION

For the reasons stated above, I recommend that the district court deny Sampel's motions for a *Franks* hearing and for suppression of identification testimony, statements, electronic communications, GPS tracking evidence, and tangible evidence. **(Docket ## 152, 158)**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
          December 21, 2017

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

> **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

> **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[17]

> The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

> **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

> The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

> Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       December 21, 2017

---

[17] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).